FILED

SEP 17 PM 3: 2↳

# E-filing

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

GREGORY GRANT CHAPMAN, SR.            )
                                      )
            Plaintiff,                )         C07-04775 CRB
                                      )
      vs.                             )    CASE NO. _____ ADR
                                      )
            The Chronicle             )    **EMPLOYMENT DISCRIMINATION**
                                      )         **COMPLAINT**
            Defendant(s).             )
                                      )
_____     )

1.    Plaintiff resides at:

      Address ___945 Danrose Drive # H___

      City, State & Zip Code ___AMerican Canyon CA 94503___

      Phone ___707-648-7016___

2.    Defendant is located at:
      The  Chronicle:925 Mission St. SF CA.
      Address _____94103_____

      City, State & Zip Code _____

3.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employ-

ment discrimination. Jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5.

Equitable and other relief is sought under 42 U.S.C. Section 2000e-5(g).

4.    The acts complained of in this suit concern:

      a.  xxFailure to employ me.

      b.  XXTermination of my employment.

Form-Intake 2 (Rev. 4/05)                    - 1 -

1    c.  xx Failure to promote me.

2    d.  xx Other acts as specified below.

3    DISCRIMINATION

4    HARASSMENT

5    PERJURY AND FRAUD

6    OBSTRUCTION OF JUSTICE

7    PLEASE SEE ATTACHED STATEMENT.A

8

9    5.    Defendant's conduct is discriminatory with respect to the following:

10    a. xx My race or color.

11    b. xx My religion.

12    c. xx My sex.

13    d. xx My national origin.

14    e. xx Other as specified below.

15    All the above including Gender.

16    6.    The basic facts surrounding my claim of discrimination are:

17    There has been and continues to be a violation of emplyment

18    opportunities,denied entitlements as a QIW (Qualified Injured

19    Worker), with an injury greater than 25%. Continuous dispa-
      rate treatment and threats of retaliation.

20

21    Please see attached  statement B.

22

23

24

25    7.    The alleged discrimination occurred on or about 2000-present    .

26    Please see attached statement C.    (DATE)

27    8.    I filed charges with the Federal Equal Employment Opportunity Commission (or the

28    California Department of Fair Employment and Housing) regarding defendant's alleged

Form-Intake 2 (Rev. 4/05)            - 2 -

1    discriminatory conduct on or about __May-August 22, 2006__

2                                    (DATE)

3    9.    The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter

4    (copy attached), which was received by me on or about ___December 20, 2006__

5                                    (DATE)

6    10.    Plaintiff hereby demands a jury for all claims for which a jury is permitted:

7          Yes _XXX_    No ____

8    11.    WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,

9    including injunctive orders, damages, costs, and attorney fees.    See Attachment D.

10          SEPTEMBER                                    $10. MILLION

11    DATED: ____17+H____ , 2007        Gregory Grant Chapman SR.

12                                    SIGNATURE OF PLAINTIFF

13

14    (PLEASE NOTE: NOTARIZATION        Gregory Grant Chapman. SR.

15    IS NOT REQUIRED.)                    PLAINTIFF'S NAME

16                                    (Printed or Typed)

17

18

19

20

21

22

23

24

25

26

27

28

Form-Intake 2 (Rev. 4/05)                - 3 -

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Gregory Chapman<br>38 Sarcedo Way<br>American Canyon, CA 94503 | From: San Francisco District Office - 550<br>350 The Embarcadero<br>Suite 500<br>San Francisco, CA 94105 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))

| EEOC Charge No.<br>550-2006-01838 | EEOC Representative<br>Linda A. Scanlan,<br>Investigator | Telephone No.<br>(415) 625-5672 |
|---|---|---|

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this Notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

*Michael Baldonado*

H. Joan Ehrlich,
**District Director**

12/18/06
*(Date Mailed)*

Enclosure(s)

cc: Calvin Siemer
SAN FRANCISCO CHRONICLE
901 Mission Street
San Francisco, CA 94103

Enclosure with EEOC
Form 161 (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS --** **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),**
**or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* **this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS -- Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than** **2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 -- not 12/1/02 -- in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION -- Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do **not** relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE -- All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request** **within 6 months** **of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Attachment A

**Discrimination**

**The discrimination was not only systemic, it was  also  multi-level. It shows that the**

**Chronicle did  not enforce but violated its zero tolerance policy to deny me equal**

**protection and employment opportunity.As a result , loss of wages, health and**

**welfare benefits,  and pension occurred. They also subjected me  to a harmful a nd**

**hostile work environment which included not only being unfairly treated and**

**disciplined, but a history of being charged of other people's crimes. In the  '93**

**Turner incident, it was determined by the Mt. View police dept. that Ms. Turner**

**had committed a battery against me,yet the company found I was at fault and**

**proceeded to discipline me for it by putting disciplinary letters in my file(see Palm**

**and Wheldon letters) and banning me from the Mt. View office ( see M. Haney's**

**statement). This is a case of discrimation being multi-layered as it not only**

**encompasses  gender but also race, and national origin.  As a result of this Turner**

**incident,in a conversation I had with Eddie Holmes, he tells me he was told to stay**

**out of the vending area and that management  said that they did not want "any big**

black men" lurking around (sic). Then there is the letter from Les Yee in 2000 re

disrupting dock operations and being sent home on two occassions. Being

unlawfully banned from worksites ( specifically the Richmond plant, where my

pictures were posted at the gate), creating further hardship.

Harassment

Around October 1999, I reported the sexual harassment incident  to Local 921

Business Agent Julian Torres.I reported that my co-worker Tony Saab had  touched

me and had made explicit sexual comments to me. I agreed to handle this

fraternally.In a written  statement to EEOC and in an interview with Senior Agent

Jon Ek of EEOC,Mr. Torres reiterated that Tony Saab had confessed to sexually

harassing me and that he would apologize.But Mr. Saab never apologized but

instead ,the harassment increased. Mr Homer Martin testified to the EEOC that

Tony Saab had confided in him that he was persuaded by Management ( namely

Supervisor Iris Al-Uqdah) to further provoke the situation in the hopes that it

would culminate in my termination.  To this  end, I can present a timeline to show

where the company did not conduct an investigation at all. The one rogue

investigation they relied on( Mr. Yee's independent investigation) found no

wrongdoing but I was still disciplined. I was put on six month's probation, I was

illegally banned from the Richmond plant,the hostile work environment forced me

to temporarily bid off my shift, which later became permanent, creating loss of

seniority,wages, health and welfare accruements, and shifts.

After  being hurt in 2000 and being subjected once again to the medical/legal

quagmire of Workers Compensation system, their disparate treatment only became

worse because they are self-funded.Hardships that they failed to deliver on the job

or in the workplace, they certainly made up for under their brutal control of this

system. I was consistently denied  authorization for treatment of my left foot , which

has lifetime medical coverage. If they do authorize it, it is after numerous and

insistent attempts by my treating physician,Dr. T. Grotz. In   1998, my treating

physician Dr. Van Gorder of Kaiser Permanente had qualified my pysche claim as

worker's compensation as an industrial injury at the percentage of  51/49%, yet the

Chronicle denied it as an Industrial injury forcing me to claim SDI, resulting in a

$20,000 lien against me.  To purposely be denied and disqualified from receiving

any entitlements not only caused mental and physical pain but also great financial

hardship for my family. It is very discriminatory in practice because it was later

discovered that the Chronicle, in collusion with the union had crafted a deal

violating the CBA (collective bargaining agreement) by allowing another employee,

Jerry Bleu, to receive disability benefits while  he earned regular wages. He was also

allowed to substitute his treatment as an industrial injury to qualify for benefits he

was clearly not entitled to. In addition the comapnay and the union have

participated in racketeering practices that given ghe present climate at the DOJ, can

only be assessed in this court.

 In 2003 , after  more  than 10 years of trying to collect a vacation balance of  8.6

shifts they owed since 1989, they finally sent me the money but later disguising it as

wages earned  as income while I was on Workers Comp, they disqualified me from

any entitlements and benefits, accruements into pension and income from Workers

Comp.  For three years (from 01/02/03 thru 10/03/2006), I did not receive  one penny

from the Chronicle.

The union's failure to honor its contractual and fiduciary obligation not only

equally contributed to the discriminatory practices  by allowing them to happen but

also by  violating its own as well as company policy in regards to the proper

representation and protection of its own membership/employees. Furthermore , the

union is guilty of violating the CBA grievance process ( Skelly, Weingarter,Clayton

acts). Pursuant to Article II,Sec. 2-3 (g) of the Teamster Constitution, these crimes

were committed with direct knowledge by Secretary/Traesurer mike Killean and his

administration in violation of title VII of the Civil rights Act by not conducting an

investigation or colluding with the company to interfere or change the outcome of

an investigation and/or obstructing the reporting of a crime.

We are also petitioning the courts for a judgement of default for failure to answer

the complaint in a timely manner sfter being properly served. A motion for

summary judgement is filed against Beeson Tayer Bodine for unfair labor practices,

aiding and abetting and knowingly causing harm to myself and the union body by

offering illegal assistance and support to a labor organization as well as the union

body by crafting what will hereby be known as the Bleu doctrine: an injury to one is

an injury to all.

**Perjury and Fraud**

The company has given false statements to EEOC like allegedly conducting an
investigation and as to who conducted it.

**Obstruction of Justice**

The company's perjury and fraud caused the obstruction of justice.

ATTACHMENT B

The EEOC's words have not been underwritten by any actions.On

12/01/06 I was called by both Michelle Nardella and Tom McGee( I

believe Ms. Nardella identified herself asan enforcement manager or

supervisor) both confirming that EEOC had made a determination that my

case would go before mediation and that a Ms. Linda Scanlon had been

assigned to investigate my case. In my conversation with Ms. Scanlon on

12/04/2006 she made claims that the respondent stated that I was unfit for

service in regards to returning to work. I believe she also stated the

company's policy of not having Modified/Alternative work or not

allowing accomodations (under ADA guidelines, I am a Qualified Injured

Worker with a disability that is 25% or greater, which means that the

employer must offer some accomodation).The company has never even

conducted any of the proposed or recommended testing or st.udies. The

call then became somewhat heated and ended quite abruptly with Ms.

Scanlon hanging up on me. Upon trying to resume our conversation, I

reached her voicemail where I promptly asked for my right to sue letter .

I tried once again on 12/15/2006 and I was again dispatched to her

voicemail, where I reterated my request for my RTS letter .

Ms. Inga Madden's request dated 8/7/2007 is the first time I've

heard from the Chronicle in 3 or 4 years to schedule any interactive

meeting  in regards to the process of returning me to work. In july

of 2005,in a letter addressed to Jay Thomas, but answered  by Ms.

Madden, I was told that an expired TRO (temporary restraining

order) was the reason for denying my employment. It is also

around this time that I received a letter from Mr. Wesolowski of

Laughlin. Falbo,Levy and Moresi  asking on behalf of the

Chronicle to purchase my resignation for one month's salary minus

SDI assesments.

I believe that this matter can only be adjudicated in this court given the

employer's practice of poor corporate citizenship and the culture of

corruption that exists at the chronicle and given their wide sphere of

influence to persuade and manipulate like-minded enforcement agencies

such as union or government enforcement agencies. Case in point is

Senior Investigator Mr. Jon Ek's lie about being unable to contact me. Mr.

Ek's own log reflects he was not on a search for the truth. On 1/8/2001, I

discovered Mr. Ek with an incomplete file of evidence and witness

statements that had been submitted to the EEOC. When questioned about

the near empty file, Mr. Ek's only retort was that he had no explanation. or

witnessese who collaborated my claims of harassment and disparate

treatment. By their own volition,and by invoking sovereign immunity ,

essentially the EEOC admits in their own motion to dismiss to being

inefficient and negligent with the recent resignation of our Atty. Gen. Who

controlled 90,000 employees at the DOJ ( dept. of Justice) to oversee and

protect the rights of 300 million Americans is most probably corrupt as \
well.

Case No C07-1527-SBA

Attachment C

It is certainly not my wish to try this case in the intial complaint. It appears that

the Defendant's issue is more with the intake forms( last revised in 4/05) and how

It was completed. But it also appears that they are disengenuous in having

no knowledge of these  lodged complaints as they have always been the

legal counsel for The Chronicle.

In regards to their  motion to dismiss complaint for failure to state a claim, the

attachments address the facts of the claim and with this the defendant aasumes

that the  facts alleged in the complaint are true. It should also satisfy the motion

for moredefinitive statement.

In defense that my claim is vague and ambiguous,I have indefensible evidence

that counsel for Defendant (Chronicle) lied and committed fraud/ mail fraud by

producing andsubmitting a counterfeit and forged document when this service

was not provided by the USPS then (march '01 and was not provided  until June

'02) and by offering intentionally misleading statements to the courts to obtain a

summary judgement in which to establish and create a phony  fraudulent timeline

for their argument of  my late filing based on when I received my right to sue

letter from the EEOC. This deperate deception was not only due to the fact that it

was impossible to win against a zero tolerance policy .

It also breached a verbal agreement on a global settlement between myself and

counsel for Littler Mendelson Sandro garofalo. It was first breache d when the

representative for the Chronicle had misrepresented themselves as having the

power to authorize settlementagreement w/c was required as part of the

ADR/ENE process. The offer was based on the Chronicle's offer of a global

settlement to settle all relevant issues which included both elements of civil

litigation and sexual harfassment, workplace discrimination settling any

worker's comp issues such as AOE/COE, causation, compromise and release of

any disputed or negotiable claims and any future benefits such as my lifetime

medical and my future retirement pension.

Attachment D

Relief

Part of the relief sought is to be set free from the company's control of my income,

wages, equity pensions and  general pursuit of  happiness. I am also seeking

 monetary compensation in the amount of $10 million dollars to include any

punitive/penalties as part of  this  settlement under   Rule 26

(a)(1)(e) , this information is not offered solely for impeachment purposes but as a

means of calculating damages for settlement.

MEMORANDUM OF POINTS

HISTORY IN THE WORKPLACE

It all began with T. Weldon and his vendetta in   September 20,1993. A

vendetta is like a curse and to my knowledge , it has never been removed.

The cause of this vendetta is my bringing up charges  on Angela Turner,

Mountain View Supervisor , case number 93-12101,citation

number G-325505, violation of 242 pc battery.  The retaliation was that  I

was charged with her crime. I had letters of discipline placed in my

permanent employee file which is a demotion of merit.

 Part of the threat of retaliation was that I was

told to drop charges or be terminated although it was determined by

Officer Soqui, Badge S2784 of the Mountain View Police dept.

 that a battery has been committed. In  the consequent letter from John

Palm, dated Oct. 27,1993, I was charged with insubordination , and

based on his biased his findings found Ms. Turner innocent and

admonished me on going thru the proper channels in this incident.

Per union dispatch, Doug Lelonde, notifying the

Mountain View PD was the proper course of action.Mr. palm also advised

me to go to the union when this was clearly a civil matter.

On November 1,1994  during the SF newspaper strike,after coming to the

aid of a union brother,I was falsely identified by the company to the

Richmond police  as the one who hit someone on the head with a riot stick

or flashlight. As a consequence,I was assaulted by police and taken into

custody.I was suspended  for 18 days.Later, this issue was dismissed by

Richmond municipal court  due to a mistaken identity after reviewing the

company's own videotape of the incident.

April 25 ,1995, I was injured and was off until June of 1997. This marked

the  disparate treatment by the company's brutal control of the worker's

compensation system because the company is self-insured. During this

two and a half years of lost employment, I was subjected to non-

treatment,malpractice by not prescribing the correct treatment and the

interruption of disability payments ( at one time, for as long as six

months). Although I was  employed by the agency initially as a foot

messenger, this began the company's  campaign to disqualify me as being

unfit for service. The report by Dr. Hutchinson makes mention of  my

injury being pre-existing. In a letter from Claims Management  to Dr.

Cimino, they asked him to lie about  my condition as being

When I returned to work in June 1997, my first day back , I was

instructed,together with a co-worker,  to clean up  toxic fuel and waste

after a co-worker had an accident.This was done  without any hazardous

waste equipment/apparatus to protect us. We were intstructed to be at the

site before law enforcement got there.  After a  few weeks back, I came to

the aid of a woman in a  company shed on my first stop in Marin, who was

inebriated and drugged.After consulting with the supervisor on duty, Iris al
–Uqdah she

instructed me  to get her out of there because it created a liability.When I

re-approached , the woman looked dead ,I tried to get a response from her

but was non-responsive so I then I called the paramedics and the police

who were able to revive her. It turned out that she was a newspaper

thrower for the company .When I arrived at the Union city

plant at the end of my run, Harry Lytell , the dispatcher chided

me for being late and threatened to next

time put it in writing.He changed the tachometer in my truck, noted that I

was on overtime and announced that he was not going to sign my

overtime.He acknowledged that he knew of the incident but told me to

save people on my own time. Harry Lytell later emailed company

management asking that I be terminated for insubordination.

Overtime was later authorized.

In December of 1997, there was another crucial incident.I was unloading

in the docking area of a newspaper shed in Hayward and left enough

room , as I always do, for people to get

around me. Some guy from another company pulled up in an enormous

1

2      truck and told me to move.  The rule of the road basically is the first one

3
      there gets to do what they have to do.He got angry, got in his truck and
4

5      pulled right up in front of my truck so that I was unable to back up again.

6

7      He then gets out of the truck, calls  a bigwig from my company  on his cell

8
      phone and puts  me on the phone with him. After hearing what I had to
9

10
      say, I was instructed by the same  bigwig not to move. The guy snatches
11

12      the phone back, breaks part of it, curses at me and then gets a drill bit from

13

14      his vehicle and threatens me with physical violence. He  then gets a knife

15
      from the same vehicle and threatens to
16

17      cut my brake lining.  I called   Transportation Manager Leslie Yee and  the

18

19      first words out  of him were " What did you do now? This is when the

20

21      special unit Officer Steve Coffey came with pepperspray,

22
       pointed it at me  and asked me   to drop the knife. By this time,
23

24       the perpetrator had hidden his knife and was acting  like

25

26      the aggrieved party. Another Hispanic driver from Fed Ex witnessed the

27

28

1       incident and  confirmed that the other guy was the aggressor.

2

3       It turned out later that the perpetrator  was someone affiliated

4

5       with  George Allen ,trustee/ dispatcher for the union . He sponsored

6

7       him for AA or some similar program.Mr. Allen later apologized

8       to me in behalf of this man. I tried to tell Dr, Whyman all these in my

9

10      interview with him when I went out on stress,  and although he called my

11

12      case an "extraordinary examination", as a trier of facts, he was very

13      dismissive  and already had a built-in bias in behalf of his client, the

14

15      Chronicle. As a QME, he is a company doctor  but  as such ,he showed

16

17      concealment which caused me treatment that I needed. To quote Dr.

18      Goldfield  in his July 13,1999 report,"Dr .Whyman indicates there are

19

20      certainly industrial stressors and were the claim to have been filed before

21

22      1993-1994, it would likely have been accepted".

23

24      Dr. Whyman  notes on p. 14 of his report that after I came back to

25      Work I cited several examples of what I perceived to be unfair

26

27  treatment      and goes to

28

say  that after his" careful inquiry, there did not appear to be any particular

negative ramifications." But under the cumulative  stress disability, the

stress factors have to be considered retro-actively.A continual trauma does

not have to occur all at once.

On p.11 of Dr. Whyman's report, it is important to note that I have never

seen a mental health counselor in the past as I could always handle things

myself.On p. 13, review of medical records, there are no no pyschiatric

records. These substantiate  my claims of no pre-existing mental condition

before all these incidents occurred but they still continue to cite

preexisiting factors where there are none.Pursuant to LC  4663., if you are

injured at work due to a preexisting or underlying condition , you may

have a workers compensation claim. But to be covered, there must be

something new about the injury. It cannot be a reoccurence or a one-time

flare-up  of an old injury. To qualify for workers comp the injury must be

either an aggaravation ,worsening of an underlying condition, whether

work-related or not or a new injury that develops as a result of a prior

industrial injury. Given the history of disparate treatment and hostile work

environment, I would qualify under both.

On a psychodiagnostic report dated June 9,1998, it is important to also

note that it was done without benefit of records review or interviewing me.

It was around December of 97 or early 98 when I gave a deposition about

The Hayward knife incident to an insurance adjuster, whose name I

believe was Bill Ahn, who I believe had connections with Gaul Security,

the company's security at the time, headed by Ray Gaul.In a letter dated

June 28,1998 from my lawyer, Byron T. Smith requesting ALL files,

video surveillance,reports,statements (signed or unsigned),copies of any

DIA –500 ,or other forms of correspondence sent to me, the request for all

these items including this deposition NEVER surfaced.

On June 2, 1998 , my treating physician ,Dr, Joel van Gorder of Kaiser

placed me just partly more than 50% disabled. Yet the company's

doctor,Dr. Whyman purposely concealed knowledge of that report that

should have qualified me for treatment under Workers Compensation. In

addition, the company's insurance agency, Claims Management Inc. on

June 26,1998denied my psyche claim because it was non-indutrial

according to them. This is even after Dr. Van Gorder's report of me

suffering due to job stress and depression for several years and putting on

disability on June 2,1998.

I went back to work in Sept. 1999, during the first day I was back,under

my treating physician Dr. Van Gorder's orders I was supposed to be

working with restrictions because I was on medication. I was informed by

Transportation Manager Leslie Yee that I was ordered by the company

doctor, Dr.. Andrews to work with no restrictions, which included driving,

violating DOT rules making me drive under the influence of medication

that will impair my driving skills.

On November 8,1999, Supervisor I ris Al-Uqdah upset at being removed

from her supervisorial duties that day to ride with me on orders of

1   Transportation Manager Leslie Yee to prove that I was doing everything

2

3   by the book and obeying all traffic laws, started retaliating against Mr.

4

5   Chapman and her perceived demotion and personal affront toher authority.

6

7   She refused to sign Mr. Chapman's overtime, overtime they both

8   concurred was accrued while in observance of all traffic laws and new

9

10   conditions that have been performed up to a professional standard.

11

12   On November 14, I was sent home by Ms. Al-Uqdah for being 15 minutes

13   late due to inclement weather. MR. Yee states that I was penalized one

14

15   day's pay for being 15 minutes late.He claims there is a verbal warning

16

17   form the front office yet could not show documentation to support it.If Ms.

18

19   Al-Uqdah's  claim that the verbal warning is counseling, it would be

20   nullified with no record to support it..It appears that reimbursement of that

21

22   day's pay acts to clear me.A letter of discipline was palced in my

23

24   file,clearly unfair discipline. It si also noteworthy that Mr, Yee's

25   structured probation of Mr. Chapman not only began before his illegal

26

27   investigation concluded but was established on the day he called his

28

transportation fact-finding meeting, clearly establishing guilt before
innocence.

On November 29,Ms. Al Uqdah sent me home for allegedly disrupting
dock operations and use of profanity. With the unwritten rule of the 15-
minute grace period, the record shows that my replacement would have
been notified at least 30 minutes to replace me before I was considered
late.My replacement arrived shortly after I did. Another driver, Mike
Ogdens, is on record saying that Ms. Al-Uqdah was overheard boasting on
the dock that if I was even one-minute late, I would be sent home. I was
angrily approached by another driver, John Anderson. Prior to his
approach, he was last seen talking to Ms. Al-Uqdah. Mr. Anderson was
one of the drivers threatened to have extra loading and unloading to
compensate for my alleged tardiness and unavailability. Mr. Anderson
angrily expressed that his impending hardship is due to my exercising my
rights to do things by the book. The discussion got heated , Mr. Anderson

DECLARATION OF PLAINTIFF

I, GREGORY GRANT CHAPMAN, SR. DECLARE UNDER PENALTY
OF PERJURY THAT :

1. I AM THE PLAINTIFF IN THE CASE OF GREGORY CHAPMAN
SR. VS . EEOC /ADA, THE CHRONICLE AND LOCAL 853

(FORMERLY 921).

On or about 2001 to present, I was subjected to a hostile work
environment and disparate treatment, denied my benefits and suffered loss
of job opportunities, loss of seniority due to Defendant's violation of its
own policy and Title Vii of the CRA.. They also committed fraud to deny
me justice.

I declare under penalty of perjury that the foregoing is true and correct.

Date: Sept. 7,2007          By: Gregory Grant Chapman, Sr.
                                Plaintiff, In Pro Per

uses profanity which I reiterateand at this point Ms. Al-Uqdah jumps up

and orders me to leave for insubordination. Afterward she posts a memo

signed by her in the guard station illegally banning me from the premises,

affecting my means of livelihood. In the december 2 meeting, this incident

was questioned by   Anthony  Sarantities ,Liason for the Safety Dept.as to

why Ms. Al-Uqdah sent me home as  opposed to simply docking me for

being 15 minutes late.

One wonders how Mr. Yee could assign something as bold as "disrupting

dock operations( which is equal only in definition to an act of terrorism

based ona an investigation in which Mr. Yee acknowledges everyone

interviewed gave a very vague conclusion. So it beg one to ask; why

would you  charge a person with misconduct then admit there were no

clear basis for discipline then structure a disciplinary probation to reward

that alleged bad act?So illogically,Mr. Yee paid me for disrupting dock

operations. The corresponding letter from local 921 states that Mr Yee

clearly erred in his use of 'disrupting dock operations", claiming my

innocence but also called his investigation inconclusive. His reference to

me " keeping the peace" acknowledges the existence of a hostile work

environment. It is saying that I am not the trouble-maker but the victim

and applauds me for my voluntary removal as being the only alternative

from this hardship. This sacrifice on my part, voluntary or not still goes to

reason athat I was being subjected to a hostile work environment, Mr,

Yee's unfair discipline together with his subordinate, Ms. Al-Uqdah ,

substantiate my claims to this .

Mr. Yee's actions may also support a quid pro quo element. The scenario

is bid off your shift and accept unfounded disciplinary action in exchange

for a day's pay that had no justification being taken from me. My well-

being was contingent on my accdepting an unfair discipline and

constructed removal from my shift.

In further response to the Nov. 14 incident, we would like to offer proof

that I was disciplined only by Mr. Yee and never received " counseling "

1      from Ms. Al-Uqdah, contrary to her assertions. I was aked to leave a 5

2

3      minutes after  arriving to work.So if this counseling  lead to discipline, I

4

5      would have invoked my union rights and asked for a shop steward ,at the

6

7      very least. I learned   from the November 14 meeting that a co-worker ,

8      Tony Saab was one of those who had a complaint against me.  This

9

10     alleged meeting never took place. Unknown to Ms. Al –uqdah, I had

11

12     already previously filed a complaint with Local 921 four days prior, on

13     Nov. 10,1999 regarding Mr. Saab's sexual harassment to business agent

14

15     Julian Torres. Consequently , because Mr. Saab's level of offensive

16

17     behavior escalated ( the standard for workplace violence includes veiled

18

19     threats,non-verbal and gestures, all of which Mr. Saab did. According to

20     the  Supreme Court, it did not matter whether or not the harasser was gay,

21

22     or sexually interested in his same-sex victim. " The statute simply does not

23

24     require a plaintiff to always show the conduct was motivated by ana ctual

25     interest in sexual activity with the palintiff... rather sexual harassment can

26     include verbal or physical misconduct or communication of a sexual

27

28

nature" that has the effect of substantially interfering with the plaintiff's

employment or creating a hostile work environment). I lodged a second

complaint on December 1, 1999 with Local 921, specifically with Mike

Killean, which lead to a same day visit with Ms.Betty Cutter in Human

Resources. It is very strange that the same day I visited Ms. Cutter , the

company's zero tolerance policy was revised and the meomo circulated on

Dec. 3,1999. One of the changes to the zero tolerance policy  was that it

now had to be in writing versus just verbal previously.I was sent to Ms.

Cutter, at Mike Killean's directive, as I had expressed some reservation

about Mr. Gary Dunham ( employee relations representative) investigating

my case. I refused to go to Mr. Dunham, not because I was homophobic,

but because I had  knowledge of  Mr. Dunham's inappropriate behavior  in

the past.

I felt that the agency violated its own policies ( SFNA Equal Employment,

anti-harassment policy) by Mr. Richard Jordan's insistence that the case

1    be referred to Mr. Dunham when the policies themeselves have certain

2

3    recusal rights, even with the new revision. And I had originally asked for

4

5    his recusal on Dec. 1,1999 followed by another request on Dec. 2,1999

6

7    thru Richard Jordan at our Transportation meeting.

8    I find out about the conspiracy between Ms. Al-Uqdah and Mr. Saab

9

10   through another co-worker, Homer Martin in mid –December.

11

12   Ms. Betty Cutter's June 2,2000 letter states that on Novemebr 20,1999, I

13   had met with her, the Chronicle's Personnel manager , to discuss concerns

14

15   I had regarding conversation I had with Ms. Al-Uqdah. Ms. Cutter's

16

17   statement is an outright fabrication. In offering the truth,most

18   notably,November 20th, 1999 was a Saturday and the Human Resource

19

20   Dept, would have been closed that weekend.

21

22   It is apparent that Mr. Dunham and Ms. Cutter have perjured themselves

23

24   by fabricating a statement with intentional malice. Per Mr. Gary

25   Dunham's memo dated February 14,200, I was aked about any other

26

27   concerns or incidents of continued harassment since the time I talked to

28

Ms. Cutter. I answered in the positive and stated my concern about mr.

Saab maybe committing an act of violence against me as he was glaring at

me at work. Mr Dunham then asked me if I had any other basis to believe

that Mr. Saab would commit an act of violence against him. I could offer

no other basis but mentioned reading a court case in which the glaring of

a Mafia hitman in a courthouse against a witness was determined to be

sufficient basis for the witness to fear for his life.

As for Ms. Cutter conducting an alleged investigation, I believe this to be

impossible. By Ms. Cutter's own admission,she requested names of

witnesses in late March and then again in April. This is along with Mr.

Dunham's admission that he had relied heavily on Ms. Cutter's notes

from the deposition she took in December.

I first went to Ms. Cutter on Dec. 1,1999 to give an oral statement.She

did not take notes in this meeting. She stated she would start looking into

it after she got back in two weeks from Chicago. And altho' I had asked

1    that Mr. Dunham to be recused in December, he continued to conduct the

2

3    investigation until I asked him again in February to re-recuse himself. Ms.

4

5    Cutter wrote in late March saying she is now taking over the

6    investigation, several weeks after my second request for Mr. Dunham's

7

8    recusal..Mr. Haney , one of the witnesses , was called in May, 6 months

9

10   after the investigation was supposed to have been started. Mr. Artz

11   concluded the investigation shortly thereafter in June , 2000 after

12

13   appointing Ms. Cutter in April. Based on her request on March/April for

14

15   MY statement and names of witnesses   ,she could not have conducted a

16

17   thorough investigation. I would like to reiterate that I never met with Ms.

18

19   Cutter and Richard Jordan on Nov. 30,1999 contrary to what they are

20

21   stating.The only times I met with them were on Dec. 1 and Dec. 2  when

22

23   Mr. Killean took me to Ms. Cutter. I had told Mr. Jordan on Dec. 2 that I

24

25   wanted Mr. Dunham to recuse himself from the investigation.

26

27

28

On Sept. 20,2001 ,a summary judgement was entered in favor of the

Defendants. This summary judgement is very inaccurate and misleading.

What Mr. Garofalo does not tell the court is that delivery confirmation

receipt allegedly in my EEOC file was not in the original file copy I

requested from the EEOC in May ,2001 but was discovered while

reviewing my file personally at the EEOC office . This was the first time I

have ever seen the receipt. The counterfeit confirmation via the USPS

website was first revealed leading to the summary judgement in

Sept.,2002 with my counsel at he time asking if I have seen it prior to the

motion for summary judgement, which I have not. Mr. Garofalo does not

include the following details: the receipt has no identifying features

whatsoever with no information concerning sender/sendee, no postmark

verifying that postage was paid or that it was ever in the postal system. At

the time Mr. Garofalo claims to have accessed the USPS website for the

confirmation they offered as evidence, it was  purged  shortly thereafter

from the  USPS  system with no one unable to verify what he presented as

evidence. To begin with, the service of delivery confirmation did not exist

at the time  the way they said it existed. That service could only be

provided with priority mail for packages and parcels ,not first class

documents, which the EEOC does not use to send their Right-to-Sue

letters. This service began in june  of 2002 but still required the priority

service for first class documents.It has always been my testimony that the

Right-to-Sue letter  was not received on the 14th of March and it definitely

was not sent via priority mail. The delivery confirmation is proof of

mailing only and verifies that it goes from zip-code to zip-code and not

directly to the addressee's home. This service is signature confirmation,

which is a record of receipt. But because the delivery confirmation receipt

is blank,it cannot verify itself , and the web confirmation does not identify

what kind of document it is , it is not sufficient evidence to verify that it is

1    confirmation they offered as evidence, it was purged shortly thereafter

2

3    from the USPS system with no one unable to verify what he presented as

4
     evidence. To begin with, the service of delivery confirmation did not exist
5

6    at the time the way they said it existed. That service could only be

7

8    provided with priority mail for packages and parcels ,not first class

9
     documents, which the EEOC does not use to send their Right-to-Sue
10

11
     letters. This service began in june of 2002 but still required the priority
12

13    service for first class documents.It has always been my testimony that the

14

15    Right-to-Sue letter was not received on the 14th of March and it definitely

16
     was not sent via priority mail. The delivery confirmation is proof of
17

18
     mailing only and verifies that it goes from zip-code to zip-code and not
19

20    directly to the addressee's home. This service is signature confirmation,

21

22    which is a record of receipt. But because the delivery confirmation receipt

23
     is blank,it cannot verify itself , and the web confirmation does not identify
24

25    what kind of document it is , it is not sufficient evidence to verify that it is

26

27

28

the Right-to-Sue letter. Quite obviously, the Right-to-Sue letter carries no

confirmation number.

Even if the evidence is admissible, it could still not live up to the claims

that Mr. Garofalo made in misrepresenting it. The US Post office verifies

the documents presented by the Defense for its lack of

trustworthiness.Once again, the document was totally blank although it

has instructions for its completion for identification purposes, has no

trackable features such as signature confirmation and above-all , it carried

no postmark, which is the gold standard for identifying mail going into the

postal mail stream.Forensic check of both intra and internet postal

database show that the document was never in the system.Pursuant to

 Rule 60 of the Federal Rules of Civil Procedure, this constitues fraud and

misrepresentation by the Defendant.

Mr. Garofalo's statement saying that I did not respond to EEOC's letter

within the 10 days  from February 8 before EEOC closes the case is a lie.I

did speak with Mr. Jon Ek and the EEOC log shows that the investigation

1
2      continued and that the case was not closed for lack of merit but because
3
4      of their supposed inability to locate me. This in itself is untrue as Mr. Ek
5
6      left at least two phone messages that were returned.he was also given
7
       several back-up number even a fax number and he did not call any of
8
9      them.The fact that I received his correspondence in t he mail indicates
10
11     there are other ways of contacting me. He also states that he could not
12
       locate the witnesses I provided, specifically Homer Martin and Mike
13
14     Haney, but this statement was disproved when the same witnesses claim
15
16     they were not even contacted by Mr. Ek.
17
18     Mr. Garofalo's claims that I received the EEOC RTS letter on March 13,
19
       2001 is an outright lie because the EEOC log claims that it was ,mailed on
20
21     the 13th and it would have been impossible for me to get it the same
22
23     day.Furthermore , the complaint states on or about the 13th, which could
24
25     mean to encompass the 13th to even the 17th. I had already began
26
       residing in Vallejo and was renovating our residence. On the weekends,I
27
28

would  return to Daly  City to spend time with my family and this is based

on my personal recollection. The Defendant also misrepresents the EEOCs

policy of  what "upon receipt " of the right-to-Sue letter means. Simply

stated, it is when it is in your possession and not when it was mailed.This

is confirmed via email to Ms. Joan Erlich (EEOC director0 and Mr.

Maldonado ( EEOC Asst. Director).

We want to reiterate that the letter was not sent in the fashion described

and this was confirmed by EEOC  mail clerk ,Terry Knapp, as well as

others at the agency.Even USPS guidelines allows a 2-3 day delivery

window and any presumption within this guideline would  still have had

me within 90 day statute of limitation.

 His claim of delivery confirmation being in my file is  again untrue  as the

original had no copy of said document but was contained in the second file

I received in December of 2002. This provided concealment for Mr.

Garofalo as  the information was irretrievable at this point.Even it it had

1   been, I would not have been able to identify it as such.

2

3   From 2002 to the present the company continues tro deny me

4
5   employment , loss of income and workers compensation benefits.From

6
7   2003 to late 2006, I have not received anything from them. I feel there is a

8   breach of contract on the global settlement they offered in 2002 before

9
10   they defrauded the court with phony evidence and denied me my justice.

11   RELIEF

12

13   I am asking for monetary compensation for all compensable and rateable

14
15   causation issues .I want the restoration of my pension,all denied benefits,

16
17   punitive and compensatory damages. I am asking for $8.6 million dollars

18   with the following breakdown:

19

20   Discrimination/Sexual harassment : $3.2 million

21

22   Loss of employment and benefits : $2 million

23
24   Punitive and Compensatory damages: $2.8 million

25   We pray the court would grant our motion and and if it does not, a leave to

26

27   Amend.

28

1
2
3
4          By:Gregory Grant Chapman,Sr
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mr. Chapman is a member of the Newspaper and Periodicals Drivers and Helpers Union Local 921 affiliated with International Brotherhood of Teamsters. Mr. Chapman possesses a commercial driver's license Class-A.

In late December of 1999/early 2000, Mr. Chapman was forced to temporarily bid off his bid shift as he was being subjected to a hostile work environment, one of them being banned from the Richmond and Mountain Vie facilities, for no reason at all. Consequently, Mr. Chapman was placed on call, getting 2 and 3 days shifts, instead of normal 5 days. Teamsters with less seniority were given 5 and 6 day shifts while Mr. Chapman was waiting for his 3rd or 4th. This resulted in Mr. Chapman's loss of health and welfare benefits and lead to having his bid shift, 5-TR illegally placed for bid.

Mr. Chapman believes that because of this unfair treatment as well as lack of union representation he was denied the opportunity for employment in what amounts to Company retaliation.

*(Note: it takes the company and the union to permit a worker to give a bid shift temporarily or otherwise and it also must be agreed upon to post a shift for bidding. This would have been under Richard Jordan's discretion)(see NLRB affidavit of Mr. Chapman pg. 5 line 8)*

In regards to Ms. Al-Uqdah's allegations, Mr. Chapman finds them to be of no merit at all. She claims that Mr. Chapman received complaints from various co-workers regarding poor work performance. Specifically, she brought attention to what she referred to as the "slow pace" that Mr. Chapman supposedly worked. Also, stating that Mr. Chapman was always late arriving to work and returning from delivery runs. *(In fact Ms. Al-Uqdah herself has a history of coming in to work late.)*

She also states that other drivers were forced to shoulder additional loading and unloading of bundles in order to compensate for Mr. Chapman's tardiness and unavailability. It should be duly noted that in regards to Mr. Chapman's "slow pace", there is no absolute pace to follow. Each individual worker adopts his or her own pace. This company has a greater than 60 year history of there being no physical standard that mandates one must carry more than one bundle at a time*(note: according to contract regulations regarding safety, one bundle can weigh as much as 42.5 lbs. In comparison, UPS standards require two people to carry anything over 75 lbs; that's 2 bundles @42.5= 85lbs.)* There is no agility test to measure one driver's ability or physicality over the next. If this were enforceable, it would be a contractual obligation. Another reason that may explain the need for a slower pace is that preceding the mid-2000 sale of the SFNA by the Hearst Corporation, the company had promotions such as "Bonus Days", attempts by the company to increase circulation sales by giving away free papers to entice subscribers. This could increase a driver's load by 50 to 100 bundles. They had additional zoning for coverage areas ,increased advertisements which meant more inserts, as well as the size of the bundle itself. Depending on the bundle, they were in 20's,30's or 40's

the smallest reflecting the bigger paper, producing a bigger bundle, thus an increased bulk count which in turn meant increased loading time. This usually leads to an increase in the weight in which a bundle travels to be loaded. It also requires additional press, which in the industry is known as "double-pressing" (in the case of a semi, "triple-pressing).
E.G.
If a driver is being " double –pressed", you have twice the production on one truck. To get that truck loaded faster means you intentionally hold up production on another truck. You also increase the need for additional manpower because according to contract regulations, if you  double-press a Bobcat 16 ft. truck, you have to have two men per truck, with usually a third man to offer spacing between the bundles to avoid overtaxing the conveyor belt( too much weight will stop the conveyor belt). Semis are usually "triple-pressed , with the same formula for additional men, per above. Please note that with the increased production standards, there is also an increased chance of blowing a press or having it go down.

All these are production problems and are totally out of the scope of a driver's control. In addition to these production issues, it is not uncommon for a plant to lose a press and have to have papers shipped from one plant to the next. Sometimes, supervisors will not request for additional manpower because their bonuses or incentives are contingent on them completing the task with  existing manpower  in the plant. With the supervisors not requesting extra dock hands places an automatic additional workload on the existing workforce , further creating delays.

As stated in the first paragraph of the defendant's summary, transportation drivers are mainly responsible for loading and unloading newspapers, inserts and several miscellaneous items such as poly bags,other dealer/carrier supplies and at times, even unschedules deliveries of make-up color bundles.

So, outside of production reasons, there is simply no way  that Mr. Chapman's returning late  from a delivery run affect another driver, particularly on " insert" days when Mr. Chapman was given the directive by Ms. Al-Uqdah to spot the newspapers separate from the inserts, which in turn meant that Mr. Chapman would have to make two separate trips for each product.

 As for Ms. Al-Uqdah's claim that other drivers at times were forced to shoulder additional  loading or unloading tasks to compensate for Mr. Chapman's tardiness and unavailability on the dock, again with the exception of some pre-loaded truck, most drivers load and unload their own  truck. It  is also important to note that on Mr. Chapman's shift ,he normally leaves 15- to 20 minutes after  signing in to do a run to Oakland Airport as this cargo is time sensitive.It also noteworthy  that Mr. Chapman only works with Ms. Al-Uqdah 2 nights a week and  when he was not required to go to the Airport, he would load or set-up trucks until 9:00- 9:30 at night then the presses would go down till 11:45, sometimes until midnight.  Also, at the conclusion of Mr. Chapman's shift Ms. Al-Uqdah has already gone for the day.

Concerning tardiness, I have had ONE written warning for tardiness and ironically, it is as a result of Ms. Al-Uqdah's retaliation.

Concerning the Santa Venetia dealer, he is identified as Coleman Holiday. Please note that it takes 25 minutes to cross the Richmond-San Rafael depending on Cal-Trans or night-time traffic.Mr. Holiday is the 5th spot out of six, with four spots before him.It is also important to note that upon arrival on the previous four spots, they are usually unoccupied, that is Mr. Chapman gets there before the dealers and carriers arrive. It appears that Mr. Holiday simply can not accept the fact that there are other factors involved to delivering the newspaper in a timely fashion than Mr. Chapman's driving ability.Those factors being that his lot is always littered with parked and abandoned cars, which blocks a driver's means of ingress or egress, and on many occasions unstacked piles of wooden palettes at the apex to his shed. This not only adds difficulty for backing up but ends up being costly for time. It appears absurd with all these tangible factors that Ms. Al-Udah and Mr. Holiday would like to make me a culprit. Mr. Holiday even took it upon himself along with Ms. Al-uqdah and Mr. Yee to encourage me to violate the speed laws.

As for Mr. Holiday's claim of alleged loss of income, it more duly caused by production problems, not Mr. Chapman's lack of ability or competence. It also should be noted that around that time of the paper's pending sale, the Agency voluntarily and significantly reduced its newsstand prices from $.50 to $.25.

The dealer's complaint had already been addressed in fact-finding meeting called by transportation manager Leslie Yee on Dec. 2,1999. In attendance were Anthony Sarantities, (Transportation Director), Richard Jordan, (VP/Human Resources and Labor Relations), and in an unofficial capacity, Mike Killean, ( Secretary of treasury, Local 921). It was affirmed in that meeting that the driver is protected contractually and that his work and jurisdiction on the truck is for the sole purpose of doing his job and is protected and consorted activity. This is well-defined and has no ambiguity. An employer can not have intentional interference with that contract, especially if it prevents the employee from performing the work.

It is the driver's responsibility, and since 1939, the employer has granted this jurisdiction as part of the collective bargaining agreement. Dealers and carriers have their own directive that do not include interference with driver's jurisdiction. Ms. Al-Uqdah should know this also creates a potential liability on the employer.She once was directly involved in an incident where a driver had a bad accident and then there was a dispute over Ms. Al-Uqdah allowing unauthorized personnel in a company vehicle. And as to the true nature to the complaint that Mr. Chapman was unwilling to unload more than one bundle at a time and refused to accept unneeded assistance from non-union or unauthorized persons, and appear to complete his task at a deliberately slow pace, this is because before and then again on November 8,1999. This time with both Ms. Al-Uqdah and Mr. Holiday present ( w/ Ms. Al-Uqdah as a rider), Mr Chapman when asked by Mr. Holiday as to why Ms. Al-uqdah was present reiterated that he would no longer

jeopardize his livelihood, which is his commercial driver's license and that from then on, all operations will be done by the book and in accordance with union rules, with all traffic and speed laws to be abided by and all union by-laws to be respected and adhered to. Mr. Holiday would no longer be allowed to take bundles off the driver's truck but to assure proper bundle count and safety, would wait for the driver to count and unload them.

Ms. Al-Uqdah appeared upset at having been removed from her supervisorial duties that day and being ordered to ride with Mr. Chapman. Mr Chapman would be told later that she viewed it as a demotion and she viewed Mr. Chapman's decision as a personal affront to her authority. November 8 was the first day Mr. Chapman started noting Ms. Al-Uqdah's retaliation .She refused to sign Mr. Chapman's overtime, overtime they both concurred was accrued while in observance of all traffic laws and new conditions that have been performed up to a professional standard (see attached tachometer and msc. Documents)

In looking at the Nov. 14 and 29 incidents wherein Mr. Chapman was unfairly disciplined,three major questions arise:

1.  As a conflict of interest, why was Mr. Yee allowed to conduct an investigation of his own department?
2.  Why was there an investigation if it were a "counseling" session?
3.  Why was Mr. Chapman being disciplined if it were only a "counseling " session? In Mr. Yee's Feb.29,2000 letter, he notes the Nov. 14 and 29 incidents and notes that actions have been assigned or taken. *The Nov. 14 incident is when Ms. Al-Uqdah sent Mr. Chapman home for being15 minutes late due to inclement weather. Mr. Yee states Mr. Chapman have been penalized one day's pay for reporting to work 15 minutes late. He claims there is verbal warning the from the front office yet has no documentation to support it.So if Ms. Al-Uqdah's claim that the verbal warning is counseling, it would be nullified with no record to support it. Since then, it appears that reimbursement of that day's pay acts to clear Mr. Chapman. The letter, admittedly without foundation, was placed in Mr. Chapman's file, no less a demotion in merit and clearly unfair discipline.It is also noteworthy that Mr Yee's structured probation of Mr. Chapman not only began before his illegal investigation concluded but was established on the day he called his transportation fact-finding meeting, clearly establishing guilt before innocence.*
    *The Nov. 29 incident was when Ms. Al-Uqdah sent Mr. Chapman home for allegedly disrupting dock operations and use of profanity. With the unwritten rule of the 15-minute grace period,the record shows that Mr. Chapman's*
    NOV 14TH *replacement would have been notified to replace Mr. Chapman before Mr. Chapman was considered late. Another driver ,Mike Ogdens, is on record as saying that Ms. Al-Uqdah was overheard boasting on the dock that if Mr. Chapman was even on minute late, he would be sent home. Mr. Chapman was angrily approached by another driver, Mr. John Anderson. Prior to his approach, he was seen talking to Ms. Al-Uqdah. Mr. Anderson was one of the drivers*

*threatened to have extra loading and unloading to compensate for Mr.
Chapman's alleged tardiness and unavailability. Mr. Anderson angrily expressed
that his impending hardship is due to Mr. Chapman's exercising his rights to do
things by the book. The discussion got heated,Mr Anderson uses profanity which
was reiterated by Mr. Chapman and at this point , Ms. Al-Uqdah jumpsup and
demands that Mr. Chapman leave for insubordination.This prompted the
company to post a memo at the guard station banning Mr. Chapman from the
premises,signed by Ms. Al-Uqdah. It was also questioned by Anthony Sarantities
in the Dec.2 meeting as to why Ms. Al-Uqdah sent Mr. Chapman home as
opposed to simply docking him for being 15 minutes late.*

One wonders how Mr. Yee could assign something as bold as "disrupting dock
operations"( which is equal only in definition to an act of terrorism)based on an
investigation in which Mr. Yee acknowledges everyone interviewed have
attributed to giving a very vague conclusion. (vague= not clear ,obscure, to
conceal). So it begs one to ask, why would you first charge a person with
misconduct then admit there were no clear basis for discipline then structure a
disciplinary probation to reward that alleged bad act? So illogically, Mr . Yee paid
Mr. Chapman for disrupting dock operations. The corresponding letter from local
921 states that Mr. Yee clearly erred in his use of " disrupting dock operations",
claiming Mr. Chapman's innocence but it also called the investigation
inconclusive. Also, Mr. Yee's reference to Mr. Chapman's " **keeping the
peace**" acknowledges the existence of a hostile work environment. It is saying in
fact that Mr. Chapman is not the trouble-maker but the victim and applauds him
for his voluntary removal as being the only alternative from this
hardship.Moreover, this sacrifice by Mr. Chapman, voluntary or not still goes to
reason believes he was being subjected to a hostile work environment and
Mr.Yee's unfair discipline , in conjunction with his subordinate , Ms. Al-Uqdah,
substantiate Mr. Chapman's claims.

Mr. Yee's actions may also support a quid pro quo element ( this for that).The
scenario is bid off your shift and accept unfounded disciplinary action in
exchange for a day's pay that had no justification being taken from Mr. Chapman.
Mr. Chapman's financial well-being was contingent on him accepting an unfair
discipline and constructed removal from his shift.

*At this point, it is important to note that although Mr. Chapman and Mr. Saab's
employment run concurrent for approximately 8-10 years, according to company
documents, at the time Mr. Chapman was harassed, Tony Saab just returned to the
agency as a new hire (7/98). Prior to Mr. Chapman's return in Sept. of 1999, he had
been off from May of 1995 to June of 1997, then approximately March of 1998 to
September 199 from an industrial injury. So the actual time leading to the sexual
harassment is approximately one month from Mr. Chapman's return. This would
argue against consensual acquaintanship by the agency.*

In further response to the Nov. 14th incident, we would like to offer proof that Mr.
Chapman was disciplined only by Mr. Yee and never received counseling from Ms. Al-

Uqdah. This is contrary to Ms. Al-Uqdah's assertions that Mr. Chapman learned from the Nov. 14 meeting that a co-worker, Tony Saab was one of those who had a complaint This alleged meeting never took place. Unknown to Ms. Al-Uqdah, Mr. Chapman had already filed a complaint with Local 921 four days prior ,on Nov. 10 ,1999 regarding Mr. Saab's sexual harassment (see attached) Consequently, because Mr. Saab's level of offensive behavior escalated, **(the standard for workplace violence includes veiled threats, non –verbal and gestures, all of which Mr. Saab did. According to the Supreme Court it did not matter whether or not the harasser was gay , or sexually interested in his same-sex victim. " The statute simply does not require a plaintiff to always show the conduct was motivated by an actual interest in sexual activity with the plaintiff... rather, sexual harassment can include "verbal or physical conduct or communication of a sexual nature" that has the effect of substantially interfering with the plaintiff's employment or creating a hostile work environment". )** Mr. Chapman lodged a second complaint On Dec.1,1999 with Local 921, specifically with Mr. Mike Killean which lead to a same day visit to Ms. Betty Cutter in Human Resources. Mr. Chapman was sent to Ms. Cutter, at Mike Killean's directive, as he had expressed some reservation about Mr. Gary Dunham investigating his case.Mr. Chapman refused to go to Mr. Dunham, not because he was homophobic, but because he had knowledge of inappropriate behavior about Mr. Dunham. Mr.Chapman felt that the agency violated its own policy (see attached SFNA Equal employment , harassment policy) by Mr Richard Jordan's insistence that the case be referred to Mr. Dunham. Furthermore, Mr. Chapman learned about the conspiracy between Ms. Al-Uqdah and Mr. Saab through another co-worker, Homer Martin (see  attached letter from Mr. Martin) approximately mid-December.

Ms. Betty Cutter's June 2,2000  letter states that on November 20,1999, Mr. Chapman met with Ms. Cutter, the Chronicle's Personnel Manager, to discuss concerns  he had regarding conversations he had with Ms. Al-Uqdah. Ms. Cutter's statement is an outright fabrication.In offering the  truth, most notably, November 20th 1999 was a Saturday  and the Human Resource Department would have been closed that weekend.

It is apparent from this paragraph that Ms. Cutter and Mr. Dunham have perjured themselves by fabricating a statement with intentional malice. As per Mr. Gary Dunham's memo dated   February 14,2000 he asks Mr. Chapman about any other concerns or incidents of continued harassment since the time he talked to Ms. Cutter. Mr. Chapman answered in the positive and stated his concern about Mr. Saab maybe committing an act of violence and when asked why, he believes it was because Mr. Saab glares at him. Mr. Dunham then asked Mr. Chapman if he had any other basis to believe that Mr. Saab would commit an act of violence against him. He could offer no other basis but then mentioned his reading a court case in which glaring of an alleged Mafia hitman in a courthouse against a witness was determined to be a sufficient basis for the witness to be in fear of his  life.
**(Pls. Note that Mr. Chapman's conversation with Mr. Dunham that included the topic of any additional incident or sexual harassment is the only time Mr. Chapman brought up the glaring incident . This conversation took place in February 2000 so**

**there is no way it could be offered as statements from Ms. Cutter several months prior to them being said <Nov. 1999>)**

As for Ms. Cutter conducting an alleged investigation, Mr. Chapman believes this to be impossible. By Ms. Cutter's own admission, she requested names of witnesses in late March and then again in April. This is along with Mr. Dunham's admission that he had relied heavily on Ms. Cutter's notes from the deposition she took in December.

As for Mr. Richard Jordan claiming to have met with Mr. Chapman to investigate his complaint against Ms. Al-Uqdah,the only meeting Mr. Chapman attended with both Mr. Jordan and Mr. Killean was on Dec.2, 1999 w/c was a fact-finding meeting concerning the subject and then briefly after, in Richard Jordan's office to discuss the sexual harassment in which Mr. Chapman believed at that time Gary Dunham was recused. Mr. Chapman also believes that the relationship between Mr. Jordan and Mr. Killean may be in violation of certain RICO statutes as they have a history of proven collusion ( see attachments).

Please note that Mr. Killean's April 17th letter states that Mr. Yee had erred and should serve to acquit and exonerate Mr. Chapman's alleged disrupting dock operations.

It is stated that Ms. Al-Uqdah's actions were not motivated by any discriminatory animus. We not only feel that we have shown this to be contradictory but also driven by animosity. On the basis of race or shared heritage, the Supreme Court recently ruled that this is not a license for bigotry and there exists too much empirical data documneting the ills of black- on- black crime.