| | |
|---|---|
| Operator: | (Inaudible). |
| Loi Chapman: | Alright, can you please transfer me to his extension please. |
| Operator: | Sure, hold on. |
| Loi Chapman: | Thank you. |
| Terry Knapp: | Good afternoon, EEOC, Terry speaking. May I help you? |
| Loi Chapman: | Hi Terry, my name is Loi Chapman. How are you? |
| Terry Knapp: | Pretty good mam. |
| Loi Chapman: | I have a question for you if you don't mind please. |
| Terry Knapp: | Um um. |
| Loi Chapman: | On your Right to Sue letters, how do you send them? |
| Terry Knapp: | How do we send them? |
| Loi Chapman: | Yea. |
| Terry Knapp: | You mean what system do we use? |
| Loi Chapman: | Yea. |
| Terry Knapp: | We send them out through regular mail. |
| Loi Chapman: | Regular mail? |
| Terry Knapp: | Um um. |
| Loi Chapman: | And how long has this procedure been in place? |
| Terry Knapp: | Oh, quite a number of years now. |
| Loi Chapman: | Thank you so much Terry. |
| Terry Knapp: | Okay mam. |
| Loe Chapman: | Bye bye. |

| | |
|---|---|
| Eric Ross: | Okay, well, if you can prove that then you've got all you need. |
| Gregory Chapman: | Okay, one more question I want to ask you then I'll let you go and that is, I think the other (inaudible word) you said is I need to, like if the judge or the lawyer needs to talk to you that you wouldn't have any problem being contacted telephonically. Does that still stand? |
| Eric Ross: | Yea, I mean they can call and ask me questions about the post office. If I can answer them I have no problems. I can talk to them. |
| Gregory Chapman: | Is this the best number to get a hold of you? |
| Eric Ross: | This number, same number. |
| Gregory Chapman: | 558-... |
| Eric Ross: | ...1834. |
| Gregory Chapman: | Okay, 1834? |
| Eric Ross: | Yea. |
| Gregory Chapman: | Thanks for your time. |
| Eric Ross: | Alright, have a nice day. |
| Gregory Chapman: | This conversation took place on Tuesday, October 29th in the year 2002 approximately 1:30 to 2:00 p.m. |
| Gregory Chapman: | Friday, 3:44 p.m. |
| Recording: | Hello, you have reached the EEOC in San Francisco. To reach an English-speaking operator press 0 at any time. |
| Operator: | EEOC. |
| Gregory Chapman: | Hi. Is it possible to speak to Rosario? |
| Operator: | She's away from her desk at the moment. Can I leave a message for her? |

Page 19

# SAN FRANCISCO NEWSPAPER AGENCY

*Agent of*

San Francisco Chronicle    San Francisco Examiner

James W. Artz
*Vice President*
*Human Resources and Labor Relations*

June 6, 2000

Mr. Greg Chapman
735 Larchmont Drive
Daly City, CA  94015

Dear Mr. Chapman:

Your assertion that Tony Saab sexually harassed you by creating a hostile work environment was investigated at my request by Human Resources Manager, Betty Cutter. Based on the information made available to Ms. Cutter during the course of her investigation, it has been determined that the evidence does not support a finding that Mr. Saab violated Agency policy or engaged in sexual harassment.

In response to your letter inquiring about the status of the investigation related to incidents involving your supervisor, Ms. Al-Uqdah, I have spoken to Richard Jordan and he advises me that he met with you and your union representative to investigate these complaints. The conclusion was that Ms. Al-Uqdah's actions were appropriate under the circumstances and were initiated by complaints from the dealer and not as a result of any discriminatory treatment.

We thank you for the information you and others provided during the investigation. Agency policy prohibits retaliation against any employee who reports or provides information during an investigation of this nature. The situation will be monitored by appropriate officials in the Circulation Department to insure this does not occur.

The Agency is committed to its policy that sexual harassment in the workplace is not permitted. In this instance, we have found a lack of evidence to conclude that any actions, words or behavior on the part of Mr. Saab towards you amounted to sexual harassment.

Sincerely,

cc:   Steve Johnson
      Leslie Yee

# SAN FRANCISCO NEWSPAPER AGENCY
*Agent of*

## San Francisco Chronicle   San Francisco Examiner

Betty Cutter
*Personnel Manager*

June 23, 2000

Mr. Tony Saab
1256 Glen Drive
San Leandro, CA  94577

Dear Mr. Saab:

The Agency has concluded its investigation of the allegation brought by Greg Chapman complaining that you engaged in conduct amounting to a violation of the Agency's policy prohibiting sexual harassment.  Jim Artz, Vice-President of Human Resources and Labor Relations has notified Mr. Chapman that the evidence received during the course of the investigation does not support a conclusion that you violated Agency policy.  The matter is considered closed and no reference to the complaint or the investigation will appear in your personnel file.

As we do with all employees who are the subject of an investigation, I do want to remind you that the Agency's "Equal Employment Opportunity, Non-Discrimination and Anti-Harassment Policies" prohibit retaliation against an employee for having brought a complaint to our attention.  I certainly believe you have no intention to retaliate against Mr. Chapman.

Should you have any questions or concerns, please feel free to contact me.

Sincerely,

*Betty Cutter*

Betty Cutter

925 MISSION STREET, SAN FRANCISCO, CA 94103 • FAX: 415-974-0540 • TEL: 415-777-7640

schedule:

**Less than 1 year:**

1/25th of a day's pay for each day worked in the preceding calendar year to a maximum of two (2) weeks (ten (10) working days); provided, a total of 225 days worked shall qualify the employee for 10 days vacation.

**More than 1 year but less than 5 years:**

1/16th of a day's pay for each day worked in the preceding calendar year to a maximum of three (3) weeks (fifteen (15) working days); provided, a total of 215 days worked shall qualify the employee for 15 days vacation.

**Employees with 5 years or more:**

1/9 of a day's pay for each day worked in the preceding calendar year to a maximum of five (5) weeks (twenty-five (25) working days); provided, a total of 205 days worked shall qualify the employee for 25 days of vacation.

**(b)** Leaves of absence granted by the Employer shall not count as breaks in continuous service. In computing the vacation period, time spent on such leaves shall not be counted in service time.

**(c)** The vacation is not to be cumulative.

**(d)** Vacation pay as herein provided shall be pro-rated at the night shift rate of pay for all time worked on night shifts at the day rate. The subsistence pay as set forth in Section 17 (i) shall not be considered any part of the night shift rate of pay for vacation credits. Vacation pay shall include the home delivery differential for both regular drivers and swingmen.

**(e)** Upon termination of employment the employee who has been regularly employed six (6) months or more shall receive pro rata of vacation pay.

**(f)** In accordance with office requirements, the Employer and the Union shall jointly arrange a mutually satisfactory schedule when vacations are to be taken, between the beginning of the first financial week in January and the end of the last financial week in December. The vacation schedule shall have separate postings by product and department, unless mutually agreed otherwise. The days of the vacation shall be consecutive. Insofar as practicable, in the giving out of vacations, seniority shall be followed.

**(g)** "Continuous service" or "seniority" as used herein includes employment with the San Francisco Newspaper Agency and past employment with any of the following San Francisco newspapers: EXAMINER, CHRONICLE, NEWS-CALL BULLETIN, CALL BULLETIN, NEWS.

**(h)** FAMILY EMERGENCIES - Employees shall have the right to use up to five (5) days of vacation annually for family emergencies. Family Leave Act provisions will be incorporated into this contract.

## SECTION 26
## SENIORITY

**(a)** Whenever there is a decrease or increase in the number of employees, seniority shall prevail. The last person hired shall be the first person laid off, and the last person to be laid off shall be the first to be returned to work. It is expressly understood that in bidding on all jobs, seniority shall prevail

34                                    35

at all times. Provided for purposes of bidding for jobs, lay off and rehire the Employer shall select the employee who, in its opinion is the most qualified, reliable and competent to perform the work from those employees who have the same seniority date. A single seniority roster of all regular full time employees of the Employer showing name and last date of entering continuous service shall be posted in a place accessible to those affected. "Continuous Service" shall include employment as defined in sub-Section 24(g). Such roster shall be kept up-to-date. A current seniority list shall be furnished by the Employer to the Union within sixty (60) days after the execution of this Agreement, and thereafter semi-annually. An employee who feels that his posted seniority date is incorrect may protest such date to a joint Employer-Union committee that will be established to handle such protest. Only one such appeal will be entertained. The decision of the joint Employer-Union committee shall be final. Thereafter, no protest will be allowed except in the case of a typographical error.

(b) The overall continuous service seniority date of all regular full-time employees employed by the Employer at the time this Agreement is signed shall stand as recorded in above in sub-Section 25(a). An employee hired on or before the date this Agreement is signed shall not attain seniority until working a minimum of sixty-six (66) shifts. An employee hired after the date this Agreement is signed shall not attain seniority until after working a minimum of ninety (90) shifts. During said probationary period a person may be discharged subject to Section 30, sub-Section (c). The probationary period shall begin upon completion of the training school. After working the probationary period following successful completion of the training program, an employee's seniority date shall revert to the first day that the employee entered the training program.

(c)  Job Bidding

(1) Bidding for jobs, when permitted by this Section, shall be by seniority as defined in Paragraph (a), above. Jobs will be bid when a vacancy is created by resignation, discharge, death, retirement, or when a newly created position is established. Bidding shall not be confined to the classification and office or branch office where the employee is assigned. Any job opening in the following five (5) classifications shall be subject to bid:

>       Home Delivery
>       Transportation Department
>       Street Sales
>       Rack Repairperson
>       Fork Lift Operator

(2) The jobs open for bid shall be posted by the Union, and employees must be competent and reliable to perform the work. The posted notice shall list the starting time, off days and geographical location by office of each job. All such openings shall be posted for bid for two (2) calendar weeks and go into effect eighteen (18) days after the closing date.

a) All newly-created jobs will go up for bid after one hundred and thirty (130) days or when the company deems it practicable for a job to be bid, whichever comes first.

(3) If an employee bids for a job and is awarded that job, the employee must remain on that job for a minimum of nine (9) months, provided within a thirty (30) day period after accepting the new job it is determined by the Employer or, on ten days' notice, by the employee that he/she is unable to adjust to the new job for any reason, he/she will be returned to

36    37

his/her former job, and the employee with the next highest seniority who bid for said job will automatically get said job. By mutual agreement between the Employer and Union and the affected driver, an individual employee may be temporarily transferred to another job.

a) The Union will bid all jobs. The Union will not bid the vacated jobs (formerly known as secondary jobs) until a thirty (30) day calendar period has elapsed; that elapsed time starts the first day the member works the new job. All subsequent bids created as a result of this bidding process will be bid at thirty (30) calendar days following.

### (d)  Bumping Rights

(1)  In the case of a reduction in force, an employee displaced shall be allowed to exercise his seniority rights to bump a less senior employee in the same classification and at the same location.  Additional employees who are removed from their jobs by this process shall have identical bumping rights.

(2)  Once the bumping rights as set forth in (1) have been exhausted, employees who possess the necessary qualifications, overall company seniority, and who do not have bumping rights, shall displace either a less senior employee who holds a regular bid job in another classification in the same location or a less senior employee who holds a regular bid job in another classification in another location. Additional employees who are removed from their jobs by this process shall have the bumping rights provided for in (d) (1). The employee who lacks either the necessary qualification or overall seniority to displace a less senior employee who holds a regular bid job shall be returned to work in the first opening for which he (she) is qualified.

38

### (e)  Resumption of Operations

The Union pledges to make maximum effort to cooperate with the Agency in its attempts to revive circulation.

Within seven (7) days after ratification of the new contract, the Newspaper Agency will call back to work the number of employees it requires in each capacity in each office and department.  As circulation increases to prior levels, the Agency anticipates calling additional employees back.  There is no guarantee as to the number of regular bid jobs that will exist or how many jobs will exist in the general bid referred to below.  Each office or department will call back persons by seniority from the prior bid holders in such office or department.  If those persons are unavailable, the Agency will call the Union dispatcher for daily referrals.  The Agency will schedule such employees and work assignments.  They will be paid per the terms of the agreement.

Until filled by the general bid, the Agency may change starting times of such scheduled employees on 24-hour notice or by the end of their prior work shift, whichever is later.

Ninety (90) days after post-strike operations resume, the Agency will meet and confer with the Union to create job descriptions for bidding.  Within thirty (30) days thereafter, such jobs will be posted for a general bidding.

During the start-up period and prior to the general bid, the Agency will confer with the Union on individual concerns of scheduling, seniority, safety and hardship.

Job cuts subsequent to the general bid which are attributable to 1(c) or cross classification (i.e. Home Delivery and Street Sale not in existence as of November 1, 1994) will not occur

39

at a rate faster than attrition of any persons that hold bid jobs as a result of such general bid.

**Semi-Annual Rebidding:**    In February and August of each succeeding year, the Agency may exercise its rights to eliminate jobs pursuant under 1(c) and due to additional cross classifications (i.e., combining street sales and home delivery functions that were not combined as of November 1, 1994). The Agency will meet and confer with the Union thirty days prior to rebidding to discuss Agency plans to revise the biddable jobs. The Agency will post revised bid jobs for the Union to bid.

The general bid will have no effect upon the Agency's or the Union's rights in the event of, or dispute over, a layoff or reduction of force due to business downturn, elimination of edition or section of the newspapers, or elimination of or cessation of publication. In such events, the bumping provided for in a reduction in force will apply.

In the bidding, the Agency will define the Transportation bid jobs that are subject to change in schedules, location on a daily or weekly basis.

Likewise, the few utility jobs in other departments will be so described.

Between bidding periods, the Agency will continue to have the right to make reasonable realignments to district boundaries as circulation needs dictate. Between bidding periods as bid jobs become vacant, there shall be no bidding. The senior qualified substitute shall be assigned such job until the next bidding opportunity. If all of the top 5 senior qualified substitutes reject it then the Company may assign the position to any substitute.

40

In cases of disputes of common seniority dates a lottery will determine order.

(f)  There shall be no seniority on extra work, provided, full time employees laid off to reduce the force shall be employed in the order of overall continuous seniority on extra or substitute and relief work.

(g)  Continuous overall seniority with the Employer shall be broken by: (1) discharge; (2) a resignation or "quit"; (3) retirement; (4) twelve (12) consecutive months of unemployment after being laid off to reduce the force; and (5) failure to return from an authorized leave of absence. An employee with five (5) or more years of service who is discharged or resigns for reasons not related to his/her job performance, and who is subsequently rehired by the Employer, shall be reinstated for all purposes including pay with credit for past seniority after a 90-shift probationary period. The reinstated employee may be assigned to any available job as may be agreed upon between the Employer and the Union.

This provision shall also apply to any employee discharged prior to the effective date of this Agreement who otherwise meets the requirements of this provision.

(h)  The Employer, where practicable and possible to do so, shall in good faith reschedule all extra work days and short shifts to provide full consecutive five (5) day work weeks.

1. The Employer, where practicable and possible to do so, shall combine regular extra workdays into groups of 2, 3, or 4 days a week. Such workdays may be scheduled to commence not earlier than nine and one-half (9-1/2) hours after the close of the employee's preceding scheduled workday.

41

APPENDIX "A"

RE: WELFARE CONTRIBUTIONS - Workers' Compensation

This will set forth the understanding and agreement between the San Francisco Newspaper Agency and Drivers' Local 921 regarding the interpretation to be placed on Sub-Section 19 (a), of the contract's Welfare Fund provision. Our agreement is as follows:

(1) If an employee suffers an occupational disability and qualifies for Workers' Compensation, the Employer will continue to make contributions without interruption to the present Welfare Trust Fund provided for under Section 19 of the Collective Bargaining Agreement. Such payment will be made during the period the employee is receiving Workers' Compensation.

(2) The Employer shall, commencing with the first day an employee suffers an occupational disability which may qualify him for Workers' Compensation Benefits, make the Health and Welfare contributions required under Section 19 on behalf of said employee.

(3) If an employee's claimed work incurred disability is challenged by the Employer and/or its Insurance Representative, the Employer shall continue to make Health and Welfare contributions on behalf of said employee until said disputed claim is resolved. If the Insurance Company, the Workers' Compensation Board or Appeals Board denies such claim or appeal, the San Francisco Newspaper Agency will in month following said decision take credit for the Welfare contributions advanced on the next monthly welfare statement due.

62

(4) To qualify for the payments specified above, an employee who suffers an occupational disability must furnish the Employer with a written doctor's release before he is permitted to return to work.

63

April 6, 2000

Local 921
Secretary of Treasury, Mike Killean
Via Fax: 415-330-9316

Dear Mike,

I received correspondence from Transportation Manager , Leslie Yee, dated March 28,2000 which served as a written warning for tardiness , in reference to the November 14,1999 incident.

In this letter he also lays out conditions for a six month probationary period effective December 2,1999 concerning the incident that took place in November 29,1999. Mr. Yee made a determination that I was responsible for "disrupting dock operations". In that same letter, he continues to applaud me for volunteering to remove myself from my bid shift to a casual dispatch in order to keep the peace.

While it was my understanding that this gesture of extending an olive branch would be conciliatory, it would also be temporary until the conclusion of the Transportation Department's investigation. At no time was it ever going to be permanent.

Were you aware ,in any of the meetings we had, where I had agreed to give up my bid shift (5-TR) permanently or forfeited my seniority status? Do you interpret any or all of these measures as being of a disciplinary nature?

I would appreciate a written response as soon as possible. Correspondence can de addressed to : 735 Larchmont Drive, Daly City CA 94015.


Fraternally Yours,

Gregory G. Chapman , Sr.



# NEWSPAPER AND PERIODICAL DRIVERS AND HELPERS TEAMSTERS' UNION LOCAL 921

AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

MICHAEL J. KILLEAN, Secretary-Treasurer
PHIL PLATT, President
ARON COATES, Vice President
AL MARCUCCI, Recording Secretary

GEORGE ALLEN, Trustee
JAY TOMAS, Trustee
JOHN TOOMEY, Trustee

April 12, 2000

Greg Chapman
735 Larchmont Drive
Daly City, CA 94015

Dear Sir and Brother,

I received your certified letter April 11, 2000. I was unaware of any correspondence from Leslie Yee to you; I would like a copy of that letter if you still have it. Mr. Yee erred in putting you on six-months probation; the Union was never notified of this action. I will take up the matter with Anthony Sarantities as soon as possible.

Regarding your bid shift—it remains in place until the General Bid; your seniority was not forfeited.

Fraternally,

Michael J. Killean
Secretary-Treasurer

MJK/ca
cc:      File



# NEWSPAPER AND PERIODICAL
# DRIVERS AND HELPERS
# TEAMSTERS' UNION LOCAL 921

AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

MICHAEL J. KILLEAN, Secretary-Treasurer
PHIL PLENT, President
ARON CHARLES, Vice President
AL MARCHES, Recording Secretary

GEORGE ALLEN, Trustee
JAY TOMAS, Trustee
JOHN TOOMEY, Trustee

April 17, 2000

Greg Chapman
735 Larchmont Drive
Daly City, CA 94015

Dear Sir and Brother,

I met with Anthony Sarantities and Richard Jordan on the issues discussed in your earlier correspondence. We determined that the letter from Leslie Yee was not disciplinary in nature. There was a claim that "you were found guilty of disrupting dock procedures," that was not the case. After speaking to several individuals present at the time – investigators' results were inconclusive. I applaud your voluntary temporary withdrawal from your bid-shift to easy any existing tensions. At no time was there language about your permanent removal from 5-T-R in Yee's letter.

If you have any other questions or comments on this matter please call me at the office so we can set up an appointment.

Fraternally,

Michael J. Killean
Secretary-Treasurer

MJK/ca
cc:    File

Motion for Summary Judgement

I would like this Motion for Summary judgement granted to me because of the following
facts of the case:

On July 24,2007, I first heard from Inga Madden of the Chronicle, wanting to set up an
interactive process regarding my permanent work restrictions. This interactive process
was one that was agreed upon in 2004. The problems are that they did not conduct an
ergonomic study, did not have alternative or modified work even as a QIW with an
injury of more than 25%, which although it qualifies me under the ADA guidelines, they
were not willing to make accommodations for. Whereas the company had full discretion
to create a job, they refused to, claiming that I did not have the seniority ( to quote
Marco Gualco, I was in ' the lower 1/3 " in seniority. Upon double- checking on it, I
discover that I am actually in the upper portion). This is a result of two things : 1) Marco
Gualco either intentionally lied to deny me gainful employment or 2) the company
retaliation unfairly metered for my reporting of a hostile work environment.

This hostile work environment started on November 8,1999, when Ms. Al-Uqdah was
removed from her supervisorial duites and ordered to ride with me to resolve some issues
concerning a dealer. I was told later on that she viewed being ordered to ride with me a
demotion and that my decision to start doing everything by the book an affront to h er
authority. It was the first day I clearly noticed Ms. Al-Uqdah's retaliation: she refused to
sign my overtime. Overtime that we both agreed was accrued while in observance of all
traffic laws and new conditions that were performed up to a professional standard. The
hostility then continued and included being banned from both the Richmond ( illegally
posting my name at the gate banning me from the premises)and Mountain View. ( ban
continued until 2000) facilities.I was sent home twice by Ms. Al-Uqdah in November
( 14 & 29) 1999 and unfairly disciplined because of it. On November 14,, I was sent
home because I was 15 minutes late due to inclement weather. Mr. Yee states that I was
penalized one day's pay for reporting to work 15 minutes late.  He claims that there is a
verbal warning from the front office yet has no documentation to support it.If Ms. Al-
uqdah's claim that the verbal warning was counseling,it would be nullified with no record
to support it. Reimbursement of that day's pay appears to clear me. A letter of
discipline,admittedly without merit or foundation, was placed in my file , no less a
demotion in merit and clearly unfair discipline.

Then on November 14,1999 , I was sent home for allegedly disrupting dock operations
and use of profanity.Another driver, Mike Ogdens , is on record saying that Ms. Al-
Uqdah was overheard boasting on the dock that if I was even one minute late, I would

July 26,2006

Teamsters Local 853/921
2100 Merced St. Ste. B
San Leandro , CA 94577-3247

To Whom It May Concern:

On June 21, 2006, in a conversation with Business Agent/Dispatcher Steve Zucker, I requested information regarding my seniority, union benefits and pension. After giving him my current address,he stated that he will send me a copy of the updated union package to include seniority and a copy of the current bylaws.

Once again, I would like to reiterate my initial request for said packet . Please send it to 38 Sarcedo Way, American Canyon, CA 94503.

Fraternally Yours,

Gregory Grant Chapman , Sr.

RECORD OF CONTACT

Julian Torres             370-A1-0065
CP coworker

In person interview by Jon Ek at SFDO.
1-8-01          11:45

I stopped driving in October of '97 and returned to R in January of '00. I was terminated on 4/28/00.

CP called me and said Saab had crossed the line, he had jumped on CP's back with an erection and shortly thereafter said he would like to shove his arm up CP's ass.

I called Saab and told him he needed to stop acting like that and apologize to CP. This was around mid- November '99.

Saab said he was just playing around and that he would talk to CP.

R didn't interview me about the incident.

Before '97, I had been friends with both of them. I had helped Saab with R's alleged homophobia and had gotten him in to a drug rehab program.

I have had Saab to dinner at my house.

Later I had to file a charge against Saab for accusing me of threatening the life of Saab's boy friend (not an R ee).

Saab had the same attitude problem with all the ees.

There are several gay drivers at R, both male and female, but Saab is more open.

Saab is a good worker, but he wants things done his way, he is relatively aggressive. CP is easy going and is a professional actor, he is specially good at jokes. - he is playful.

I think r made a deal with Saab to complain about me and then R would pass over CP's complaint about Saab.

My home phone is (650) 869-5739

To whom it may concern,                          10/10/00

I Julian Torres testify that it is true, that while I was in the capacity
as Business Agent for I.B.T. Local 921. I did talk Tony Saab on or about
11/10/99 regarding his sexual harassment of Greg Chapman. I then
reprimanded Tony for his actions and ask him if he would apologize to
Greg Chapman. At that time Tony Saab was questioned about explicit
comments he made to Greg Chapman and he also committed a sexual act
against Greg Chapman.
Tony was questioned about stalking and touching. Tony Saab did admit
to these acts. Tony claimed these acts were coarse jesting or he was
playing.


                          Julian D. Torres

                          *[signature: Julian D Torres]*

RECORD OF CONTACT

G. Mena              370-A1-0065
CP coworker

Telephone interview by Jon Ek.    (510) 276-8695
2-25-01    17:15

CP is very friendly.

I heard CP and Tony Saab got in to trouble, but that is all.

Saab is only about 5'7" and 170 lbs.

Saab works in Richmond and I work mostly in Union City.

Saab comes and goes, he is not around that much. Recently he has been on long hauls to Fresno & c.

RECORD OF CONTACT

G. Chapman                370-A1-0065
CP

Telephone interview by Jon Ek.
1-3-01        13:30

Tony Saab trashed my dignity.

R never investigated.

I am suffering from a hostile environment.

I am currently out on Work Comp with a foot injury.

The HR person is a homosexual and I asked that he be disqualified. I asked Betty Cutter to
investigate because she seemed disinterested - [laughs].

My friends are asking me: "When are you getting married to Tony Saab?"

All this in spite of R's Zero Tolerance policy - Saab should be fired.

I will bring a written statement tomorrow.

RECORD OF CONTACT

G. Chapman          370-A1-0065
CP

In person interview by Jon Ek at SFDO.
1-8-01        10:30

My supervisor complained about my work performance.

Saab would stalk me and shine his spot light on my truck when I returned to the yard.

Saab grabbed me from behind when he had an erection. I went to the Union, but they didn't do anything.

I told my supervisor, Iris, that I would no longer drive over the speed limit just to keep my schedule.

Iris' boss, Leslie Yee, made Iris ride with me. Iris then retaliated, she reported to management that I was selling guns on the dock in May of '00.


[When he was leaving the SFDO, CP made an appointment to file a retaliation charge against Iris.

CP provided four written witness statements and will call in the names and numbers of two more.

CP refused to accept any connection between Iris' complaint about his work (allegedly based on Saab's snitching) and CP's filing this charge.

CP became angry when I tried to explain R's position so he could reply. He kept on insisting that what I was saying was my belief & I kept saying I had no knowledge or beliefs, I was only telling him what R said so he could comment and advance the investigation. We never got past that deadlock.]

February 9, 2000


Mr. Leslie Yee
Via Fax : 415-536-2420



Dear Mr. Yee:

I would like to inquire on the status of the Nov. 14 and Nov. 29, 1999 incidents
pertaining Iris Al-Uqdah that I have reported to you in December.

As you had mentioned to me in passing, you have already concluded the
investigation. As I was not given any updates in the course of the investigation, I
would like a copy of the report detailing the people you had interviewed and how
you came about your conclusion.


As always, your help is very much appreciated. If you have any questions,
please feel free to call me at 650-758-2846. You can mail the report to 735
Larchmont drive, Daly City , CA 94015.



Sincerely,

*Gregory G. Chapman SR.*

Gregory Grant Chapman, Sr.









Exhibit F



# NEWSPAPER AND PERIODICAL
# DRIVERS AND HELPERS
# TEAMSTERS' UNION LOCAL 921

AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

MICHAEL J. KILLEAN, Secretary-Treasurer
PHIL PUETT, President
ARON COATES, Vice President
AL MARCHESI, Recording Secretary

GEORGE ALLEN, Trustee
JAY TOMAS, Trustee
JOHN TOOMEY, Trustee

April 17, 2000

Greg Chapman
735 Larchmont Drive
Daly City, CA 94015

Dear Sir and Brother,

I met with Anthony Sarantities and Richard Jordan on the issues discussed in your earlier correspondence. We determined that the letter from Leslie Yee was not disciplinary in nature. There was a claim that "you were found guilty of disrupting dock procedures," that was not the case. After speaking to several individuals present at the time – investigators' results were inconclusive. I applaud your voluntary temporary withdrawal from your bid-shift to easy any existing tensions. At no time was there language about your permanent removal from 5-T-R in Yee's letter.

If you have any other questions or comments on this matter please call me at the office so we can set up an appointment.

Fraternally,

Michael J. Killean
Secretary-Treasurer

MJK/ca
cc:    File



# NEWSPAPER AND PERIODICAL
# DRIVERS AND HELPERS
# TEAMSTERS' UNION LOCAL 921

### AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS

MICHAEL J. KILLEAN, Secretary-Treasurer
PHIL PUETT, President
ARON COATES, Vice President
AL MARCHESI, Recording Secretary

GEORGE ALLEN, Trustee
JAY TOMAS, Trustee
JOHN TOOMEY, Trustee

April 12, 2000

Greg Chapman
735 Larchmont Drive
Daly City, CA 94015

Dear Sir and Brother,

I received your certified letter April 11, 2000. I was unaware of any correspondence from Leslie Yee to you; I would like a copy of that letter if you still have it. Mr. Yee erred in putting you on six-months probation; the Union was never notified of this action. I will take up the matter with Anthony Sarantities as soon as possible.

Regarding your bid shift—it remains in place until the General Bid; your seniority was not forfeited.

Fraternally,

Michael J. Killean
Secretary-Treasurer

MJK/ca
cc:      File

# SAN FRANCISCO NEWSPAPER AGENCY

*Agent of*

## San Francisco Chronicle   San Francisco Examiner

Betty Cutter
*Personnel Manager*

March 31, 2000

Mr. Gregory Chapman
735 Larchmont Drive
Daly City, CA 94015

Dear Mr. Chapman:

This in response to your letter dated March 29, 2000.

I was advised that you elected not to have Mr. Gary Dunham complete the investigation regarding the complaint you brought to the Agency.

I, therefore, have been requested to finalize this investigation. I anticipate this matter will be concluded within the next few weeks.

I did leave a message on your home answering machine to ask that if there were any witnesses to the incidents you informed me of involving Mr. Saab. If there are, I would appreciate their names.

Sincerely,

*Betty Cutter*

# SAN FRANCISCO NEWSPAPER AGENCY
*Agent of*

## San Francisco Chronicle   San Francisco Examiner

February 28, 2000

Gregory G. Chapman
735 Larchmont Dr.
Daly City, CA 94015

Dear Mr. Chapman:

This letter is in response to your inquiry about the incidents that took place on November 14, and November 29, 1999.

Regarding the November 14 incident in which you were penalized one day's pay for reporting to work 15 minutes late, although you had a verbal warning, the front office has no documentation to support this. Therefore, I will reimburse you that day's pay. Please note that this letter will serve as your first written warning concerning tardiness.

Regarding the second incident which took place on November 29 in which you were also penalized a day's pay for "disrupting dock operations" and using profanity, several drivers were interviewed, but comments were very vague.

I applaud you for volunteering to remove yourself from this bid shift to a casual dispatch in order to keep the peace. Moreover, that sacrifice by you leads me to believe that you are willing to put a close to this incident. Providing you are not involved in any disciplinary counseling or action for a six-month period starting December 2, 1999, I will reimburse that day's pay.

If you have any questions or concerns please feel free to call me at (415) 777-7528.

Sincerely,

Leslie Yee, Manager
Transportation Department

cc: File

Exhibit G₂

April 6, 2000

Local 921
Secretary of Treasury, Mike Killean
Via Fax: 415-330-9316

Dear Mike,

I received correspondence from Transportation Manager , Leslie Yee, dated March 28,2000 which served as a written warning for tardiness , in reference to the November 14,1999 incident.

In this letter he also lays out conditions for a six month probationary period effective December 2,1999 concerning the incident that took place in November 29,1999. Mr. Yee made a determination that I was responsible for "disrupting dock operations". In that same letter, he continues to applaud me for volunteering to remove myself from my bid shift to a casual dispatch in order to keep the peace.

While it was my understanding that this gesture of extending an olive branch would be conciliatory, it would also be temporary until the conclusion of the Transportation Department's investigation. At no time was it ever going to be permanent.

Were you aware ,in any of the meetings we had, where I had agreed to give up my bid shift (5-TR) permanently or forfeited my seniority status? Do you interpret any or all of these measures as being of a disciplinary nature?

I would appreciate a written response as soon as possible. Correspondence can de addressed to : <u>735 Larchmont Drive, Daly City CA 94015</u>.

Fraternally Yours,

Gregory G. Chapman ,Sr.

# SAN FRANCISCO NEWSPAPER AGENCY

*Agent of*

## San Francisco Chronicle   San Francisco Examiner

Betty Cutter
*Personnel Manager*

VIA CERTIFIED MAIL

April 20, 2000

Mr. Gregory Chapman
735 Larchmont Drive
Daly City, CA 94015

Dear Mr. Chapman:

This is a follow up to my letter to you dated March 29, 2000 (copy attached).

I am attempting to conclude my investigation regarding the complaint you brought to the Agency.

If there are any witnesses to the incidents you informed me of relating to Mr. Tony Saab, I would appreciate their names.

Sincerely,

*Betty Cutter*

# BEESON, TAYER & BODINE
### ATTORNEYS AT LAW
### A PROFESSIONAL CORPORATION
235 PINE STREET, SUITE 1200
SAN FRANCISCO, CALIFORNIA 94104-2733
(415) 986-4060
FAX (415) 986-8149

Duane B. Beeson
Donald S. Tayer
Neil Bodine
Kenneth C. Absalom
Joseph R. Colton
Robert Bonsall
Geoffrey Piller
Catherine E. Arostegui
John C. Provost
Andrew H. Baker
Tod A. Cochran
Jason Rabinowitz
Matthew Morsello

SACRAMENTO OFFICE
1001 6TH STREET
SUITE 300
SACRAMENTO 95814-3324
(916) 441-2196
FAX (916) 441-2208

OF COUNSEL
JOSEPH C. WAXMAN

August 11, 1999

Julian D. Torres
Teamsters Local 921
2660 Newhall St., Suite 111
San Francisco CA 94124

**Re:    Jerry Bleu**

Dear Julian:

This letter is in response to your request for advice on the grievance you have filed regarding SFNA employee Jerry Bleu's vacation benefits.

I understand that Jerry Bleu suffered a work-related hand injury in 1996, reported the injury at that time, but did not miss work time because of the injury until 1998, when he had surgery that was required as a direct result of the 1996 injury.

Under the 1954 "Bitler Agreement," employees who would be eligible for vacation benefits, but for time lost due to an industrial injury, continue to receive those vacation benefits, just as if they had continued to work without any time off from work. The Agreement has certain limitations, including that the vacation credits apply "only to the vacation to be taken in the calendar year following that in which the injury occurred. The Employer has cited this provision to deny Bleu vacation credits for the time lost due to his 1998 surgery.

In this case, the "injury" triggering the loss of work time occurred with the surgery in 1998. Likewise, the "injury" for purposes of applying the Bitler Agreement occurred with the 1998 surgery that caused the lost work time. This interpretation of the Bitler Agreement is also consistent with the intent of the Agreement; namely, to ensure that each employee "suffer no loss of earned vacation credits for those shifts [for which] he would have been scheduled had not the injury prevented his employment."

If you need more information about this matter, please let me know.

Very truly yours,

Andrew H. Baker

/dk

# SAN FRANCISCO NEWSPAPER AGENCY
### Agent of
## San Francisco Chronicle  San Francisco Examiner

September 9, 1999

Mr. Julian Torres, Business Agency
Newspaper and Periodical Drivers and Helpers Union, Local 921
2660 Newhall Street, Room 111
San Francisco, CA 94124

RE:   1999 Vacation Credit – Jerry Bleu

Dear Mr. Torres,

As we discussed, the Circulation Department has reviewed the unique circumstances of Jerry Bleu's claim for 1999 vacation credit based on a 1996 workers comp injury.

In order to settle this matter, please indicate your agreement to the following by signing below and returning a copy of this letter to me.

1. The Newspaper Agency will grant 1999 vacation credit to Jerry Bleu for workers comp shifts for which he received Temporary Disability benefits in 1998.

2. The Drivers Union withdraws its grievance dated June 21, 1999 (copy attached).

3. This agreement is due to unique circumstances, and is without precedent or prejudice to any other situation.

When I receive your signed copy of this letter, I will instruct our Payroll Department to credit Mr. Bleu's vacation balance.

Sincerely,

Judy Power
Labor Relations Representative

Agreed.

Julian d. Torres          Date 09/09/99
Business Agent

cc: Jim Artz, Steve Johnson, Richard Jordan, Chuck Ingrao, Mike Mullins, Tony Sarantitis

1  Gregory Grant Chapman Sr.
   945 Danrose Dr Apt-H
2  American Canyon CA., 94503
        Plaintiff (Pro Per)
3

4              UNITED STATES DISTRICT COURT

5           FOR NORTHERN DISTRICT OF CALIFORNIA

6

7  GREGORY GRANT CHAPMAN SR.,          Case No. C07-4775-SBA
8        Plaintiff,
                                       NOTICE OF MOTION AND MOTION BY
9                                      PLAINTIFF FOR SUMMARY JUDGEMENT
                                       MEMORANDUM OF POINTS AND
10                                     AUTHORITIES DECLARATION OF
                                       PLAINTIFF GREGORY G. CHAPMAN Sr.
11 THE CHRONICLE
12        Defendants,
                                       Date: June 24,2008
13                                     Time: 1:00 p.m.
                                       Courtroom:3, 3rd Floor
                                       Trial Date: None Set
14 TO DEFENDENTS THE CHRONICLE:

15 NOTICE IS HEREBY GIVEN that on June 24,2008 at 1:00 p.m. or as soon thereafter as the

16 Matter can be heard in Courtroom 3,3rd Floor, Ste 400 of the Unites States District Court located

17
   At 1301 Clay St. Oakland CA., Plaintiff Gregory Grant Chapman Sr., will and hereby does move
18

19 for an Order Granting Summary Judgement in favor of Plaintiff.

20 The motion is made on the grounds that there is no trialable issue of fact as to liability, and

21 Therefore the moving party is entitled to judgement on the issue of liability ass a matter of law.

22 The motion will be based on the Notice, the attached Declaration of Plaintiff, and the attached

23 Memorandum of Points and Authorities.

24

25 Date:_____           _____
26                                        Gregory Grant Chapman Sr.
                                             Attorney In Pro Per
27

28

                                                    CASE NO.

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

Summary of Case

I started at the San Francisco Chronicle in 1989 as a Foot Messenger and I worked my way up to a Transportation Driver Loader/ Unloader. As a Transportation Driver/ Loader/ Unloader, my responsibilities were to load and unload newspapers and insert bundles on and off my truck and to deliver them to various dealers in the Bay Area.

In 1993, while working out of the Mountain View office, I had a first hand experience of battery, retaliation and discrimination with the company through Angela Turner, a supervisor in that office (See Exhibit A, Mountain View Police report). Although it was found that a crime was committed against me The Chronicle, thru Tom Wheldon and John Palm, puts a disciplinary letter in my file and banned me from that office.

During the 1994 strike, I was falsely accused by The Chronicle to Richmond Police as having assaulted a security guard by hitting him on the head with a picket stick. As result of this accusation I was accosted and arrested by 5 police officers. The Chronicle then suspended me for 11 days until their own videotape of the incident exonerated me.

In 1995, I suffered my first injury when I fell off my truck and suffered a bad sprain. The company doctor put me on disability for several months and returned me to work as they claimed they could find no medical reason why I should be on disability. They claimed that my injury was pre-existing and non-industrial. I fought it and benefits were re-instated after more than 6 months. Even after repeated requests for treatment (surgery) from my doctor in 1995, the company did not authorize surgery for my foot until 1997. During that two year time, I was denied Worker Compensation and I was forced to go on State Disability.

Did not authorize surgery for my foot until 1997. During that two year time, I was denied Worker Compensation and I was forced to go on State Disability.

1

1
2
3
4

As a result of this, the State put a lien on me, stating this should be a Worker's Compensation claim not State Disability, which the court found in my favor and the Chronicle eventually paid for.

5
6
7
8
9
10
11
12
13
14

I went back to work in 1997 and shortly thereafter another incident occurred. On my Marin run, I had encountered a woman inside the shed and she seemed inebriated As there was no one else there, I got involved and called the paramedics and the police. After they revived her and was more responsive, the police asked me to make sure that she left okay. As her car was in the shed and she refused to leave, I left her there. 45 minutes later, upon arriving in Union City 45 minutes late, I explained to Harry (supervisor) what had happened, he tells me that they would not authorize an overtime and to " save people on your own damn time" He later reported to Les Yee ( Transportation Manager) that I was guilty of insubordination and Les Yee paid me the OT retroactively.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

In December of the same year (1997), on my Hayward run, in a cul de sac near the work shed, a man pulls down the street driving a set of doubles (a truck with two trailers) claiming he could not turn around because my truck was blocking his. He gets out and demands that I move. I calmly explained that I was already unloading and he will have to wait. He then threatens to call one of the big wigs of the Circulation dept. and when he did and I spoke with him, I was instructed to not move my truck. The guy then pulls out a giant drill bit and threatens to crush my skull, he then pulled out a knife. I called the police and told them he was trespassing and he was not allowed in the shed. When the police came, he ran up to me and told me to drop the knife. I informed him that I was the complainant and that they just walked past the assailant. Another driver with Federal Express confirmed to the police that I was the complainant. When I called my Transportation manager Leslie Yee, to report the incident his first response was " What did you do now?"

CASE NO.
C07-4775-SBA

The Chronicle sent an insurance adjuster (to the best of my recollection identified himself as Mr. Bill Nichols) to my place of residence 1333 North Camino Alto in Vallejo he was an adjuster for The Chronicle I have yet to see a report or hear of any findings of the investigation. It was later revealed that the assailant was later identified as someone being sponsored by George Allen (921 Dispatch) for a drug treatment program. Mr. Allen later apologized on his behalf. With these incidents, I filed for Workers Compensation based on stress in the workplace in January of 1998. The insurance adjuster came around and took a statement from me. This report could have substantiated my psychiatric claim, however, despite my lawyer, Byron Smith's, numerous requests and subpoena's for it, the company has never been forthcoming with it.

After being seen by several doctors, including The Chronicle's own doctor, they have continually denied me treatment, Even after receiving confirmation from their own doctor they have not yet read my doctor's report giving me a rating of 51/49 .see Calif. YA vs. Workers Comp. Appeals Board, Rodriguez vs. WCAB, Cristobal v.s. WCAB. This is crucial because I was denied psych treatment Which later became a psychiatric disability. I was subjected to a violent act in the workplace.

CASE NO.
C07-4775-SBA



# Fidelity National Title Company

50 California Street, Suite 3145 • San Francisco, CA 94111
(415) 981-5720 • FAX (415) 981-3409

**DATE:** March 5, 2001                                        **TIME:** 04:39:07
**ESCROW NO:** 635546-PC
**ESCROW OFFICER:** Patric Cuspard                  **CLOSING DATE:** March 2, 2001

## SELLER FINAL CLOSING STATEMENT

**SELLER(S):** Freddy L. Jones and Gloria M. Jones
**BUYER(S):** Eloisa Bustamante
**PROPERTY:** 1398 Hale Street, Vallejo, CA  94591

| | $ DEBITS | $ CREDITS |
|---|---|---|
| **FINANCIAL:** | | |
| Total Consideration | | 290,000.00 |
| **PRORATIONS/ADJUSTMENTS:** | | |
| Prepaid County Taxes at $956.90 Semi-Annual from 03/02/01 to 07/01/01 | | 632.62 |
| **TITLE CHARGES:** | | |
| Documentary Transfer Tax | 319.00 | |
| City Transfer Tax | 957.00 | |
| Inspection Fee | 50.00 | |
| Reconveyance(s) | 14.00 | |
| **ESCROW CHARGES** | | |
| Doc Prep Fees | 100.00 | |
| Express Mail | 15.00 | |
| Wire Fee | 20.00 | |
| **PAYOFFS - Washington Mutual** | | |
| Total Payoff $130,341.84 | | |
| Principal Balance | 128,512.98 | |
| Interest to 03/05/01 | 1,694.86 | |
| Forwarding/Demand Fee | 60.00 | |
| Reconveyance Fee | 65.00 | |
| Recording Fee | 9.00 | |
| **COMMISSIONS:** | | |
| Listing Brokers Commission to Coldwell Banker 3.00% | 8,700.00 | |
| Selling Brokers Commission to Ammiro Mortgage 3.00% | 8,700.00 | |
| **MISCELLANEOUS CHARGES:** | | |
| Solano County Tax Collector for Pay 2nd Inst 2000-2001 | 956.90 | |
| Eloisa Bustamonte for Termite Report/Work | 1,590.00 | |

SELLER(S): Freddy    Jones and Gloria M. Jones
BUYER(S): Eloisa Bustamante
PROPERTY: 1398 Hale Street, Vallejo, CA 94591

| | $ DEBITS | $ CREDITS |
|---|---|---|
| **FINANCIAL:** | | |
| Total Consideration | | 290,000.00 |
| | | |
| **PRORATIONS/ADJUSTMENTS:** | | |
| Prepaid County Taxes at $956.90 Semi-Annual from 03/02/01 to 07/01/01 | | 632.62 |
| | | |
| **TITLE CHARGES:** | | |
| Documentary Transfer Tax | 319.00 | |
| City Transfer Tax | 957.00 | |
| Inspection Fee | 50.00 | |
| Reconveyance(s) | 14.00 | |
| | | |
| **ESCROW CHARGES** | | |
| Doc Prep Fees | 100.00 | |
| Express Mail | 15.00 | |
| Wire Fee | 20.00 | |
| | | |
| **PAYOFFS - Washington Mutual** | | |
| **Total Payoff $130,341.84** | | |
| Principal Balance | 128,512.98 | |
| Interest to 03/05/01 | 1,694.86 | |
| Forwarding/Demand Fee | 60.00 | |
| Reconveyance Fee | 65.00 | |
| Recording Fee | 9.00 | |
| | | |
| **COMMISSIONS:** | | |
| Listing Brokers Commission to Coldwell Banker 3.00% | 8,700.00 | |
| Selling Brokers Commission to Ammiro Mortgage 3.00% | 8,700.00 | |
| | | |
| **MISCELLANEOUS CHARGES:** | | |
| Solano County Tax Collector for Pay 2nd Inst 2000-2001 | 956.90 | |
| Eloisa Bustamonte for Termite Report/Work | 1,590.00 | |
| Adela Reymundo pay demand | 8,700.00 | |
| Hold Roof Repairs | 5,900.00 | |
| Daniel R. Long, Attorney at Law Seller Proceeds | 123,778.88 | |
| Ken Lawn & Clean-Up Service Pay Clean up Fee | 400.00 | |
| Fidelity National Title Accom & Notary Fee | 90.00 | |
| | | |
| **TOTALS** | $ 290,632.62 | $ 290,632.62 |

**SAVE THIS STATEMENT FOR INCOME TAX PURPOSES**

1                                    Global Settlement

2    •   ENE- The ENE revealed that there was a confession letter towards the sexual

3        harassment. Mr. Torres offered as fact that Tony Saab did confess to the
4        sexual

5        harassment and also course jesting at Mr. Chapman's expense. The union

6        reprimanded him where Mr. Torres was a business agent and in his letter, Mr.

7        Torres stated that if this matter can be handled fraternally that he would
8        apologize

9        to Mr. Chapman. It also revealed that Gary Dunham was actually recused on

10       December 2, 1999. As per the company zero tolerance policy (see recusal

11       powers).
12
     •   It also revealed Mr. Haney who also attended the ENE meeting, collaborated
13       the
14
         fact that Mr. Dunham had made sexually despairing comments, "You have
15
         beautiful bedroom eyes". Counsel for the defendant, MR. Richard Hill, asked
16       Mr.
17
         Haney if the comments were offensive, and Mr. Haney stated that "giving that
18       he
19       Knew Mr. Dunham for a while, he was willing to excuse the remark but felt
         that
20
21       a reasonable person such as Mr. Chapman could definitely find it offensive

22       and/are thus grounds for Mr. Chapman's recusal".

23   •   Other issues of importance discuss me and Sandro Garofalo had a discussion

24       about the ideal of settling claims. Ironically we also revisited the statue of

25       limitations in regards to the filing of my case and when I receive my right to
26       sue
27
28

letter.  I recall we had come to a tentative verbal agreement on a monetary amount

of $300,000, which was the mortgage of my home in Vallejo and that my

workmen's compensation claims would be settled and also allowing me the

option to return to gainful employment. One of the conditions of the ENE was

that each side would have someone present how had the power to authorize a

settlement. Right after me and Mr. Garofalo's conversation, Mr. Gary Dunham

was sought out where upon it was revealed that the chronicle and Mr. Dunham

who had attend the full ENE meeting on behalf of the employer had intentionally

misrepresented himself as having the power to authorize settlement and that the

confidentiality clause was used to conceal fraud.



LITTLER MENDELSON®

April 4, 2002

Sandro Garofalo
Direct: 415.677.3105
Direct Fax: 415.743.6647
sgarofalo@littler.com

Pazit Zohar
3145 Geary Street
Suite 436
San Francisco, CA 94118

Re:    *Chapman v. San Francisco Newspaper Agency*
        U.S.D.C. for the Northern District of California, Case No. C 01 2305 CRB

Dear Ms. Zohar:

As you may know, the parties attended a case management conference last Friday before Judge Charles Breyer in the above-referenced case. Various issues were discussed, including the possibility of accomplishing a global settlement of Mr. Chapman's sexual harassment and worker's compensation claims. Judge Breyer set a further case management conference for April 26, 2002 at 8:30 a.m., and indicated that he would like you to attend the conference to ensure that any discussions regarding Mr. Chapman's worker's compensation claims are as productive as possible.

If you have any questions, or if there are any matters you wish to discuss prior to the case management conference, please call me.

Very truly yours,

Sandro Garofalo

SG

cc:    San Francisco Chronicle
SFRDOCS:30449538.1 002137.1103

THE NATIONAL EMPLOYMENT & LABOR LAW FIRM ℠

650 California Street, 20th Floor, San Francisco, California 94108.2693  Tel: 415.433.1940  Fax: 415.399.8490  www.littler.com



**CLAIMS MANAGEMENT INC.**

May 7, 2008

Gregory Chapman
38 Sarcedo Way
American Canyon, CA 94503

RE:  EMPLOYER:        San Francisco Chronicle
     CLAIM NUMBER:    2610402
     DATE OF INJURY:  8/4/2000

### NOTICE REGARDING PERMANENT DISABILITY PAYMENT TERMINATION

Dear Mr. Chapman:

Claims Management Inc. is handling your workers' compensation claim on behalf of San Francisco Chronicle. This notice is to advise you of the status of permanent disability benefits for your workers' compensation injury on the date shown above.

Payments are ending because we have paid you a reasonable amount of permanent disability benefits.

Benefits paid to you total $12,120.00. Permanent disability benefits have been paid from 10/15/2003 through 4/25/2008 at $170.00 per week.

- Please see the attached <u>detailed payment record</u> for specific periods and amount paid.

The State of California requires that you be given the following information:

You have a right to disagree with decisions affecting your claim. If you have any questions regarding the information provided to you in this notice, please call: Manjeet Thompson at (916) 631-1278. However, if you are represented by an attorney, you should call your attorney, not the claims adjuster. If you want further information on your rights to benefits or disagree with our decision, you may contact your local state Information and Assistance Office of the Workers' Compensation.

You also have the right to consult with an attorney of your choice. Should you decide to be represented by an attorney, you may or may not receive a larger award, but, unless you are determined to be ineligible for an award, the attorney's fee will be deducted from any award you might receive for disability benefits. The decision to be represented by an attorney is yours to make, but is voluntary and may not be necessary for you to receive your benefits.

To resolve a dispute, you may apply to the Workers' Compensation Appeals Board.

Sincerely,

Manjeet Thompson
Claims Examiner
cc:    San Francisco Chronicle. James Wesolowski, Esq.,
Enc.:  Information and Assistance Offices List, Payment Record

MKT LCResumS          *PO Box 3042 ● Sacramento, CA 95812-3042 ● (916) 631-1250 ● Fax No. +1 (916) 635-6288*

November 7, 2007


The Chronicle
901 Mission St.
San Francisco CA 94103

Dear Ms. Madden:

I am in receipt of your letter. Although I am still amiable to an interactive
meeting/process, due to unforeseen events, I will be unable to commit to meeting early
November, as previously and tentative agreed upon in August.


There are several factors of a personal nature, primarily being that I would like to consult
my treating physician, Dr. T. Grotz, which is scheduled on January 9,2008 at 10:30 am,
to get his opinion in regards to Dr. Ferretti's supplemental report in how my injury
relates to assessments. I will need this time for Dr. Grotz to include any
recommendations he may have and to better assess any permanent physical restrictions
and my ability to perform the essential functions of the job of a Driver/Loader/Unloader,.
This is also to review any and all reports that were used to determine the basis of Dr.
Ferretti's report. If you have not done so, please forward all of Dr. Ferreti's reports , and
any others relied on ,to Dr. Grotz and myself. I would also like to find out what your
definition of my job description is currently

Furthermore, I would like to find out if the Transportation Manager will be a part of this
process.

Since it appears to be more legal than a simple return to work issue, I need to know more
about the process so I can consult any necessary sources in determining my return to
work.

Again ,I look forward to meeting with you, but only after these issues have been
addressed.


Sincerely,

*Gregory Grant Chapman sr.*
Gregory Grant Chapman, Sr.


Cc: Dr. Thomas Grotz
     1700 California #520
     San Francisco CA 94109

Cc: James Wesolowski
     Laughlin Falbo Levy Falbo etal.
     255 California St. #600
     San Francisco CA 94111



**San Francisco Chronicle**

a Hearst Newspaper

October 25, 2007

Gregory Chapman
38 Sarcedo Way
American Canyon, Ca. 94503

Re: Scheduling of Interactive Meeting

Dear Gregory:

I received your letter dated August 31, 2007 in response to my letter of August 7, 2007. We had been advised that you were permanent and stationary in connection with your workers' compensation case with permanent restrictions and the reason for my letter, since we had been unable to speak by phone, was to set up an interactive meeting with you.

The purpose of the interactive meeting is to discuss your permanent physical restrictions and your ability to perform the essential functions of the job of a Driver-Transportation as a result of those restrictions.

In your letter of August 31, 2007 you indicate that you are able to meet for the interactive meeting in the early part of November 2007. Please advise if Monday, November 12, 2007 either at 10:00 a.m. or 2:00 p.m. would work for you. The meeting will be held at the Law Offices of Laughlin, Falbo etal., 255 California Street, 6th Floor, San Francisco, Ca. 94111.

I look forward to hearing from you.

Sincerely,

Inga Madden
Workers' Compensation Manager
415-777-7839

with all traffic laws.   At this time, she began her campaign of harassment by attempting to turn me into a pariah by telling other drivers that she would be making accomodations for me at their expense. This was what lead John Anderson to verbally assault me on Nov. 29,1999.

This event resulted with her posting an illegal memo with Security sanctioning my removal from the premises ( please  see photograph attached) when I returned to work. This is retaliatory as she did not feel threatened enough on Nov. 29 to call security but instead illegally posted this memo. This memo is illegal because protocol was not followed. Security must first be notified ,who in turn would notify  Human Resources and/or the Transportation Manager/Circulation Dept. and the Plant Manager. None of these procedures were followed. As a result of this posted memo, I was escorted off the premises by Security Officers when I  was dispatched to the Richmond facility , where  this incident occurred.

As a  pattern of this  systematic harassment  by Iris Al-uqdah, someone in Management had  mentioned to Mike  Killean, Secretary Treasure of Local 921, that Iris said I  was selling guns on the dock. I vehemently denied it and wanted to file a grievance but Mike had refused and even went  as far as to state that if I mentioned it to anyone else, he would deny it.  In the course of these events, Mr. Killean acted like he knew what was going on yet did nothing to correct them in an official capacity. Even after Leslie Yee had set up a meeting with Richard Jordan (VP, Human Resources ) ,Tony Sarantities and myself, Mike Killean was there but only in an unofficial capacity. Whenever I would approach him  to be there in an official union capacity,he would always tell me that he would be there on other business but would drop by or that any  of his comments  would be off the record and unofficial.

An example of this attitude is the impromptu meeting Gary Dunham called. In this meeting the following conversation occurred :
Gary Dunham to  Mike Killean: "Will the union get involved and bring them up on charges?" (meaning the people  who were harassing me).
Mike Killean:  " No ,we don't know who they are". (He should know as he was supposedly conducting an investigation)
Mike K. To Greg Chapman( walking out after meeting): "Gary's a bonehead (then starts to defend Richard Jordan). Rich didn't send him down here with this b---s---! You need to talk with Rich, he'll fix this".
Greg C. to Mike K: "Will you be there?"
Mike K . :  " Oh, if you want me to *sit in.*" (still non-committal)

After the fact –finding meeting with Richard Jordan, Tony Sarantities, Leslie Yee ,Mike K. and myself, Mike Killean had told me to meet him in Richard Jordan's office , as Richard wished to talk to me.While we were there, he mentioned  my sexual harassment complaint against one of the other drivers, Tony Saab. I had complained about Mr. Saab making sexual comments and acts  against me on the dock to Julian Torres, then the business agent for local 921. Mike mentioned that another driver, Ken Kerns told him about what he observed  Tony Saab doing .Mike told me to go  to Gary Dunham at  Human Resources .Earlier, at a previous meeting in Mike's office, I had mentioned my  unease  to that as Gary was a homosexual and I did not feel comfortable going to him about a same-sex sexual harassment case because I  had knowledge  that he himself  may have committed sexual improprieties. (In Richard Jordan's office, I had again reiterated my unease with Gary Dunham handling the sexual harassment case because of the above-mentioned reason  and Mr. Jordan concurred and agreed to disqualify Gary Dunham).I was told that  Ms. Betty Cutter instead will continue to  handle the case as she took my initial statement  late last year. The nonchalant mentality by  Betty Cutter when I first reported it to her set the tone for this comedy of errors . She laughed at  my account of being victimized by Mr. Saab and to add injury to insult, even questioned even  his proclivity to violence based on his sexual  orientation.

Approximately five months after going to Betty, she notifies me  that she had just been asked to investigate my claim  and wanted to re-depose me, claiming that I

never gave her names , or any information that may have aided her earlier investigation. This is an outright fabrication as she apparently had forgotten that she said she would get back to me after she came back from Chicago in December.

As I was waiting for her response ,Mr. Dunham contacted me regarding the sexual harassment case and set up an impromptu meeting scheduled during my shift at the Richmond facility.This was after I had him officially disqualified from my case. I notified the union of this impromptu meeting and asked Mike Killean if he could be there. He refused to be there officially but in true Mike Killean fashion , volunteered to be a fly on the wall, present but unavailable for comment. *(The only correct thing he has said was in his April 12,2000 letter stating that Mr. Yee had erred in putting me on 6-months probation and that Mr. Yee never notified the union of the action he meted on me. Mr. Killean is clearly running interference for the company or damage control. Mr. Killean's letter dated April 17,2000 mimics Mr. Yee's letter in applauding my voluntary and temporary removal from my bid shift. His use of the word "temporary" is to cover up the fact that he, along with the company ,had signed off in putting my shift up for bid. The permanent removal may not have been in words but the union's actions in dispatching me on call and not putting me on a shift substantiates that they did not honor my seniority. He now, without any explanation ,claims that I was not found guilty of disrupting dock procedures. How convenient that he meets with his crony, Richard Jordan and Tony Sarantities to exonerate Leslie Yee. I find it ironic that this is the only time that Mike had officially extended an invitation to meet with him.)*

At the meeting with Gary Dunham , Gary mentioned that he had " heavily relied " on Betty Cutter's notes from the original deposition she took late last year which did supply witnesses to the incident.This contradicts Ms. Cutter's assertion on her letters that she had not been given the opportunity to take a statement. It was also at this time that Gary offered Tony and I to go to conflict resolution, which by Gary's explanation is equivalent to marriage counseling.My retort was to remind him that the Agency has a zero tolerance policy for sexual harassment. He also inappropriately asked me about what type of attire I wore and the tightness of the pants I wore to work and the actions that might have lead Tony Saab to think that I was leading him on and if I had enticed Tony in any way. The meeting was concluded with me again disqualifying Gary Dunham and telling him that any future correspondence should be in writing and not any last minute messages left on my answering machine.

The next and last correspondence I received was from James Artz, dated June 6,2000, claiming that the investigation has been concluded. It is too easy to conclude 7 months after the initial complaint to say nothing was found because there was never an investigation. I do not agree with Mr. Artz' conclusion that a lack of evidence concluding that any actions, words or behaviour on the part of Mr. Saab amounted to sexual harassment against me because regardless of the company's claim to a zero tolerance policy,(copy of policy attached) Mr. Saab has repeatedly on numerous occasions, violated my right to personal space, made comments of a vile sexual nature to me and had even stalked me on company time and property. Mr. Saab not only admitted to sexual harassment but also made several threatening statements on the dock after being reprimanded by the union.

As far as Mr. Artz' assertion that Mr. Jordan participated in the November 14 and 29 incidents involving iris Al-uqdah, this is erroneous because I had only met one other time with Mr. Jordan and Mike Killean and this was on the Gary Dunham issue ,after the December hearing. If Mr. Jordan felt that he was a participant in any investigation, his non-responsiveness to any of my correspondence further proves that his participation was very minute.

Mr. Artz' conclusion that Iris Al-uqdah's actions were appropriate under circumstances and were initiated by complaints by the dealer and not as a result of any discriminatory treatment gives Mr. Artz a choice in claiming either naivete

or ignorance. He is saying that the Santa Venicia dealer ,Coleman Holiday, sent me home,  had me escorted by Security off the premises and took away two days' pay. I am to believe that all these transpired  because of a disgruntled dealer who is upset because a person did his job by the book. This is discriminatory  and retaliatory treatment. Mr. Artz' further statement of monitoring the situation by appropriate officials is very ironic as these officials could not find anything  in the initial investigation.

As far as Mr. Leslie Yee's response is concerned, per his letter, he not only disciplined me ,which goes in my file, without notifying the union but also  note that he took certain liberties in meting out the discipline. As he states in his  Feb. 28,2000 letter : " Regarding the  Nov. 14 incident in which you were penalized one day's pay for reporting to work 15 minutes late, although you had verbal warning, the front office has no documentation to support this". The fact is, I had never received a verbal warning. By Mr. Yee's own admission,there is no proof of it in the front office. Secondly, as I had stated in the first part of my statement, there is a 15-minute grace period given to every driver. Tardiness is not an offense that merits being sent home. In past practice, you will only be docked  for the time you were late.

As far as "disrupting dock operations", this goes beyond insubordination . Mr. Yee was suggesting that I held up the production of the paper and amounts to an act of terrorism.  And all this from an investigation  in which Mr. Yee was allowed to investigate his own department ,irrespective of Human Resources, and was concluded with me being found guilty . This from an investigation that was  at the same token  found to be vague and inconclusive.  His letter also technically put me on probation before  there was an investigation as  we had our  meeting with Mr. Jordan,Mr. Sarantities, Mr. Killean ,myself and Mr. Yee on  Dec. 2,1999. Discipline was not even discussed at that point, as it was still only a fact-finding meeting. Mr. Yee's applauding  me for keeping the peace acknowledges that  I was placed  in a hostile environment.

Unfortunately, this is not the first time this company subjected me to  a hostile work environment. As you can see from the attached police report, this happened to me in 1993, where  the Mountain View supervisor attacked me and was subsequently charged with battery. As a result , the company  illegally banned me from the Mountain View facility causing  financial hardship to me as  the supervisor would pull me out from my run if I had to go to that facility. The union initially never fought this unofficial ban and never filed a grievance in my behalf, even though I reported company  retaliation ,including the present day Transportation  Manager. On July 8,2000 @ approximately 11pm ,I was scheduled to go to the  Mountain View  facility. As I was preparing to go,I told Ken Macdonald,my supervisor, where I was going to go  because I didn't want any trouble. I asked him if Angela, the Mtn. View Spurvisor I had filed charges against , was working and ken said , "Yeah, now I know", acknowledging the problem , and then changed my run.

Steve Lewis, another supervisor, asked me, "Greg, is there still a problem?" I said there was and  that in the last few months, a dispatcher got a call from her commenting about me going to Mtn. View when I was banned from there.

It's sad to see people's  rights squandered at the hands of those who hide behind the guise of Good Faith and the garb of good corporate citizenship but who intentionally  fail to enforce the very  policies they crouch behind. I guess it remains true that hypocracy is still the greatest luxury.

It is my sincere hope that truth crushed asunder will rise again.

Sincerely,

Gregory Grant Chapman, Sr.

Sexual Harassment is a Crime

Brief summary of case,

Mr.Chapman is a member of Newspaper& Periodicals Drivers' &Helpers Union Local 921 affiliated with
the International Brotherhood of teamsters. Mr. Chapman posses a commercial drivers license Class-A.
In late December of 99/early Jan 00 Mr. Chapman was forced to give up his bid shift due to being subjected to a hostile work environment in which he thought to be temporarily  consequently,  Mr. Chapman was placed on call, instead of 5 day shifts he received  2&3 days shifts. At times, while others
with less seniority were given 5&6 day shifts Mr. Chapman was waiting for his 3rd or 4th. this experience
was equivalent to a loss of seniority in which Mr. Chapman suffered a loss of benefits, health&welfare and
eventually had his union bid-shift 5-TR illegally placed up for bid. Later Mr. Chapman was informed that he was banned from Mountainview & Richmond plant and these phycillities were off limit to him.  Mr. Chapman believes due to this unfair treatment as well as lack of union representation he was denied opportunity for employment in what amounts to Company retaliation.
 (note it takes the company&the union to permit a worker to give up a bid shift temporally or otherwise and it also must be agreed upon to post a shift for biding. this would have been under Richard Jordan's discretion)( see NLRB affidavit of Mr.Chapman pg5 line8)


I find Ms. Al-Uqdah allegations to be very interesting she claims that Mr.Chapman received complaints  from various co-workers regarding poor work performance.  Specifically, she brought attention to  what
she referred to as the "slow pace" that Mr.Chapman supposedly worked at. Also, stating that Mr. Chapman was always late arriving to work and returning from delivery runs. (when in fact Ms.Al-Uqdah
herself has a history of coming in to work late) Other drivers were forced to shoulder additional loading &
unloading  truck in order to compensate for Mr.Chapman's tardiness & unavailability but, it should be
duly noted that in regards to Mr.Chapman's "slow pace", that there is no absolute pace to follow. Each
individual worker adopts his or her own pace. This Company has a greater than 60 year history of there being no physical standard nothing that mandates one must carry more than one bundle at a time. (note
according to contract regulations regarding safety: one bundle can weigh as much as 42.5lbs. In comparison UPS standards  require two people to carry anything over 75lbs) (2 bundles@ 42.5 = 85lbs) There's no agility test to measure one driver's ability or physicality over the next. If  this were enforceable it would be an contractual obligation. Other reasons that may explain the need for a slower pace are, preceding the July 00 sale of the SFNA by the Hearch Corporation. During this time you had promotional such as "Bonus Days", attempts by the company to increase circulation sales by giving away free papers to entice subscribers, this could increase a driver's load by 50 to 100 bundles. They had additional zoning for coverage areas, increased advertisements which meant more inserts, as well as the size of the bundle itself. Depending on if they were in 20's, 30's or 40's  the smallest  reflecting  the bigger paper, thus a bigger bundle, thus an increased bulk count in turn

A Response to Littler Mendelson's Case Summary

Mr. Chapman is a member of the Newspaper and Periodicals Drivers and Helpers Union Local 921 affiliated with International Brotherhood of Teamsters. Mr. Chapman possesses a commercial driver's license Class-A.

In late December of 1999/early 2000, Mr. Chapman was forced to temporarily bid off his bid shift as he was being subjected to a hostile work environment, one of them being banned from the Richmond and Mountain Vie facilities, for no reason at all. Consequently, Mr. Chapman was placed on call, getting 2 and 3 days shifts, instead of normal 5 days. Teamsters with less seniority were given 5 and 6 day shifts while Mr. Chapman was waiting for his 3rd or 4th. This resulted in Mr. Chapman's loss of health and welfare benefits and lead to having his bid shift, 5-TR illegally placed for bid.

Mr. Chapman believes that because of this unfair treatment as well as lack of union representation he was denied the opportunity for employment in what amounts to Company retaliation.

*(Note: it takes the company and the union to permit a worker to give a bid shift temporarily or otherwise and it also must be agreed upon to post a shift for bidding. This would have been under Richard Jordan's discretion)(see NLRB affidavit of Mr. Chapman pg. 5 line 8)*

In regards to Ms. Al-Uqdah's allegations, Mr. Chapman finds them to be of no merit at all. She claims that Mr. Chapman received complaints from various co-workers regarding poor work performance. Specifically, she brought attention to what she referred to as the "slow pace" that Mr. Chapman supposedly worked. Also, stating that Mr. Chapman was always late arriving to work and returning from delivery runs. *(In fact Ms. Al-Uqdah herself has a history of coming in to work late.)*

She also states that other drivers were forced to shoulder additional loading and unloading of bundles in order to compensate for Mr. Chapman's tardiness and unavailability. It should be duly noted that in regards to Mr. Chapman's "slow pace", there is no absolute pace to follow. Each individual worker adopts his or her own pace. This company has a greater than 60 year history of there being no physical standard that mandates one must carry more than one bundle at a time(*note: according to contract regulations regarding safety, one bundle can weigh as much as 42.5 lbs. In comparison, UPS standards require two people to carry anything over 75 lbs; that's 2 bundles @42.5= 85lbs.*) There is no agility test to measure one driver's ability or physicality over the next. If this were enforceable, it would be a contractual obligation. Another reason that may explain the need for a slower pace is that preceding the mid-2000 sale of the SFNA by the Hearst Corporation, the company had promotions such as "Bonus Days", attempts by the company to increase circulation sales by giving away free papers to entice subscribers. This could increase a driver's load by 50 to 100 bundles. They had additional zoning for coverage areas ,increased advertisements which meant more inserts, as well as the size of the bundle itself. Depending on the bundle, they were in 20's,30's or

40's with the smallest reflecting the bigger paper, producing a bigger bundle, thus an increased bulk count which in turn meant increased loading time. This usually leads to an increase in the weight in which a bundle travels to be loaded. It also requires additional press, which in the industry is known as "double-pressing" (in the case of a semi, "triple-pressing).

E.G.

If a driver is being " double –pressed", you have twice the production on one truck. To get that truck loaded faster means you intentionally hold up production on another truck. You also increase the need for additional manpower because according to contract regulations, if you double-press a Bobcat 16 ft. truck, you have to have two men per truck, with usually a third man to offer spacing between the bundles to avoid overtaxing the conveyor belt( too much weight will stop the conveyor belt). Semis are usually "triple-pressed , with the same formula for additional men, per above. Please note that with the increased production standards, there is also an increased chance of blowing a press or having it go down.

All these are production problems and are totally out of the scope of a driver's control. In addition to these production issues, it is not uncommon for a plant to lose a press and have to have papers shipped from one plant to the next. Sometimes, supervisors will not request for additional manpower because their bonuses or incentives are contingent on them completing the task with  existing manpower  in the plant. With the supervisors not requesting extra dock hands places an automatic additional workload on the existing workforce , further creating delays.

As stated in the first paragraph of the defendant's summary, transportation drivers are mainly responsible for loading and unloading newspapers, inserts and several miscellaneous items such as poly bags,other dealer/carrier supplies and at times, even unschedules deliveries of make-up color bundles.

So, outside of production reasons, there is simply no way  that Mr. Chapman's returning late  from a delivery run affect another driver, particularly on " insert" days when Mr. Chapman was given the directive by Ms. Al-Uqdah to spot the newspapers separate from the inserts, which in turn meant that Mr. Chapman would have to make two separate trips for each product.

  As for Ms. Al-Uqdah's claim that other drivers at times were forced to shoulder additional  loading or unloading tasks to compensate for Mr. Chapman's tardiness and unavailability on the dock, again with the exception of some pre-loaded truck, most drivers load and unload their own  truck. It  is also important to note that on Mr. Chapman's shift ,he normally leaves 15- to 20 minutes after  signing in to do a run to Oakland Airport as this cargo is time sensitive.It also noteworthy  that Mr. Chapman only works with Ms. Al-Uqdah 2 nights a week and  when he was not required to go to the Airport, he would load or set-up trucks until 9:00- 9:30 at night then the presses would go down till 11:45, sometimes until midnight.  Also, at the conclusion of Mr. Chapman's shift Ms. Al-Uqdah has already gone for the day.

Concerning tardiness, I have had ONE written warning for tardiness and ironically, it is as a result of Ms. Al-Uqdah's retaliation.

Concerning the Santa Venetia dealer, he is identified as Coleman Holiday. Please note that it takes 25 minutes to cross the Richmond-San Rafael depending on Cal-Trans or night-time traffic.Mr. Holiday is the 5th spot out of six, with four spots before him.It is also important to note that upon arrival on the previous four spots, they are usually unoccupied, that is Mr. Chapman gets there before the dealers and carriers arrive. It appears that Mr. Holiday simply can not accept the fact that there are other factors involved to delivering the newspaper in a timely fashion than Mr. Chapman's driving ability.Those factors being that his lot is always littered with parked and abandoned cars, which blocks a driver's means of ingress or egress, and on many occasions unstacked piles of wooden palettes at the apex to his shed. This not only adds difficulty for backing up but ends up being costly for time. It appears absurd with all these tangible factors that Ms. Al-Udah and Mr. Holiday would like to make me a culprit. Mr. Holiday even took it upon himself along with Ms. Al-uqdah and Mr. Yee to encourage me to violate the speed laws.

As for Mr. Holiday's claim of alleged loss of income, it more duly caused by production problems, not Mr. Chapman's lack of ability or competence. It also should be noted that around that time of the paper's pending sale, the Agency voluntarily and significantly reduced its newsstand prices from $.50 to $.25.

The dealer's complaint had already been addressed in fact-finding meeting called by transportation Manager Leslie Yee on Dec. 2,1999. In attendance were Anthony Sarantities, (Transportation Director), Richard Jordan, (VP/Human Resources and Labor Relations), and in an unofficial capacity, Mike Killean, ( Secretary of treasury, Local 921). It was affirmed in that meeting that the driver is protected contractually and that his work and jurisdiction on the truck is for the sole purpose of doing his job and is protected and consorted activity. This is well-defined and has no ambiguity. An employer can not have intentional interference with that contract, especially if it prevents the employee from performing the work.

It is the driver's responsibility, and since 1939, the employer has granted this jurisdiction as part of the collective bargaining agreement. Dealers and carriers have their own directive that do not include interference with driver's jurisdiction. Ms. Al-Uqdah should know this also creates a potential liability on the employer.She once was directly involved in an incident where a driver had a bad accident and then there was a dispute over Ms. Al-Uqdah allowing unauthorized personnel in a company vehicle. And as to the true nature to the complaint that Mr. Chapman was unwilling to unload more than one bundle at a time and refused to accept unneeded assistance from non-union or unauthorized persons, and appear to complete his task at a deliberately slow pace, this is because before and then again on November 8,1999. This time with both Ms. Al-Uqdah and Mr. Holiday present ( w/ Ms. Al-Uqdah as a rider), Mr Chapman when asked by Mr. Holiday as to why Ms. Al-uqdah was present reiterated that he would no longer

jeopardize his livelihood, which is his commercial driver's license and that from then on, all operations will be done by the book and in accordance with union rules, with all traffic and speed laws to be abided by and all union by-laws to be respected and adhered to. Mr. Holiday would no longer be allowed to take bundles off the driver's truck but to assure proper bundle count and safety, would wait for the driver to count and unload them.

Ms. Al-Uqdah appeared upset at having been removed from her supervisorial duties that day and being ordered to ride with Mr. Chapman. Mr Chapman would be told later that she viewed it as a demotion and she viewed Mr. Chapman's decision as a personal affront to her authority. November 8 was the first day Mr. Chapman started noting Ms. Al-Uqdah's retaliation .She refused to sign Mr. Chapman's overtime, overtime they both concurred was accrued while in observance of all traffic laws and new conditions that have been performed up to a professional standard (see attached tachometer and msc. Documents)

In looking at the Nov. 14 and 29 incidents wherein Mr. Chapman was unfairly disciplined,three major questions arise:

1. As a conflict of interest, why was Mr. Yee allowed to conduct an investigation of his own department?
2. Why was there an investigation if it were a "counseling" session?
3. Why was Mr. Chapman being disciplined if it were only a "counseling " session? In Mr. Yee's Feb.29,2000 letter, he notes the Nov. 14 and 29 incidents and notes that actions have been assigned or taken. *The Nov. 14 incident is when Ms. Al-Uqdah sent Mr. Chapman home for being15 minutes late due to inclement weather. Mr. Yee states Mr. Chapman have been penalized one day's pay for reporting to work 15 minutes late. He claims there is verbal warning the from the front office yet has no documentation to support it.So if Ms. Al-Uqdah's claim that the verbal warning is counseling, it would be nullified with no record to support it. Since then, it appears that reimbursement of that day's pay acts to clear Mr. Chapman. The letter, admittedly without foundation, was placed in Mr. Chapman's file, no less a demotion in merit and clearly unfair discipline.It is also noteworthy that Mr Yee's structured probation of Mr. Chapman not only began before his illegal investigation concluded but was established on the day he called his transportation fact-finding meeting, clearly establishing guilt before innocence.*
*The Nov. 29 incident was when Ms. Al-Uqdah sent Mr. Chapman home for allegedly disrupting dock operations and use of profanity. With the unwritten rule of the 15-minute grace period,the record shows that Mr. Chapman's replacement would have been notified to replace Mr. Chapman before Mr. Chapman was considered late. Another driver ,Mike Ogdens, is on record as saying that Ms. Al-Uqdah was overheard boasting on the dock that if Mr. Chapman was even on minute late, he would be sent home. Mr. Chapman was angrily approached by another driver, Mr. John Anderson. Prior to his approach, he was seen talking to Ms. Al-Uqdah. Mr. Anderson was one of the drivers*

threatened to have extra loading and unloading to compensate for Mr.
Chapman's alleged tardiness and unavailability. Mr. Anderson angrily expressed
that his impending hardship is due to Mr. Chapman's exercising his rights to do
things by the book. The discussion got heated,Mr Anderson uses profanity which
was reiterated by Mr. Chapman and at this point , Ms. Al-Uqdah jumps up and
demands that Mr. Chapman leave for insubordination.This prompted the
company to post a memo at the guard station banning Mr. Chapman from the
premises,signed by Ms. Al-Uqdah. It was also questioned  by Anthony Sarantities
in the Dec.2 meeting as to why Ms. Al-Uqdah sent Mr. Chapman home as
opposed to simply docking him for being 15 minutes late.

One wonders how Mr. Yee could assign something as bold as "disrupting dock
operations"( which is equal only in definition to an act of terrorism)based on an
investigation in which  Mr. Yee acknowledges everyone interviewed have
attributed to  giving a very vague conclusion. (vague= not clear ,obscure, to
conceal). So it begs one to ask, why  would you first charge a person  with
misconduct then admit  there were no clear basis for discipline then structure a
disciplinary probation to reward that alleged bad act? So illogically, Mr . Yee paid
Mr. Chapman for disrupting dock operations. The corresponding letter from local
921 states that Mr. Yee clearly erred in his use of " disrupting dock operations",
claiming Mr. Chapman's innocence but it also called the investigation
inconclusive. Also, Mr. Yee's reference  to Mr. Chapman's **" keeping the
peace"** acknowledges the existence  of a hostile work environment. It is saying in
fact that Mr. Chapman is not the trouble-maker but the victim  and  applauds him
for his voluntary removal  as being the only alternative from this
hardship.Moreover, this sacrifice by Mr. Chapman, voluntary or not still goes to
reason believes he was being subjected to a hostile work environment and
Mr.Yee's unfair discipline , in conjunction with his subordinate , Ms. Al-Uqdah,
substantiate Mr. Chapman's claims.

Mr. Yee's actions may also  support a quid pro quo element ( this for that).The
scenario is bid off your shift and accept  unfounded disciplinary action in
exchange for a day's pay that had no justification being taken from Mr. Chapman.
Mr. Chapman's financial well-being was contingent on him accepting an unfair
discipline and constructed removal from his shift.

*At this point, it is important to note that although Mr. Chapman and Mr. Saab's
employment run concurrent for approximately 8-10 years, according to company
documents, at the time Mr. Chapman was harassed, Tony Saab just returned to the
agency as a new hire (7/98). Prior to Mr. Chapman's return in Sept. of 1999,  he had
been off from May of 1995 to June of 1997, then approximately March of 1998 to
September 199 from an  industrial injury. So the actual time leading to the sexual
harassment is approximately one month from Mr. Chapman's return. This would
argue against consensual acquaintanship by the agency.*

In further response to the Nov. 14th incident, we would like to offer proof that Mr.
Chapman was disciplined only by Mr. Yee and  never  received counseling from Ms. Al-

Uqdah. This is contrary to Ms. Al-Uqdah's assertions that Mr. Chapman learned from the Nov. 14 meeting that a co-worker, Tony Saab was one of those who had a complaint This alleged meeting never took place. Unknown to Ms. Al-Uqdah, Mr. Chapman had already filed a complaint with Local 921 four days prior ,on Nov. 10 ,1999 regarding Mr. Saab's sexual harassment (see attached) Consequently, because Mr. Saab's level of offensive behavior escalated, **(the standard for workplace violence includes veiled threats, non –verbal and gestures, all of which Mr. Saab did. According to the Supreme Court it did not matter whether or not the harasser was gay , or sexually interested in his same-sex victim. " The statute simply does not require a plaintiff to always show the conduct was motivated by an actual interest in sexual activity with the plaintiff... rather, sexual harassment can include "verbal or physical conduct or communication of a sexual nature" that has the effect of substantially interfering with the plaintiff's employment or creating a hostile work environment".** ) Mr. Chapman lodged a second complaint On Dec.1,1999 with Local 921, specifically with Mr. Mike Killean which lead to a same day visit to Ms. Betty Cutter in Human Resources. Mr. Chapman was sent to Ms. Cutter, at Mike Killean's directive, as he had expressed some reservation about Mr. Gary Dunham investigating his case.Mr. Chapman refused to go to Mr. Dunham, not because he was homophobic, but because he had knowledge of inappropriate behavior about Mr. Dunham. Mr.Chapman felt that the agency violated its own policy (see attached SFNA Equal employment , harassment policy) by Mr Richard Jordan's insistence that the case be referred to Mr. Dunham. Furthermore, Mr. Chapman learned about the conspiracy between Ms. Al-Uqdah and Mr. Saab through another co-worker, Homer Martin (see attached letter from Mr. Martin) approximately mid-December.

Ms. Betty Cutter's June 2,2000 letter states that on November 20,1999, Mr. Chapman met with Ms. Cutter, the Chronicle's Personnel Manager, to discuss concerns he had regarding conversations he had with Ms. Al-Uqdah. Ms. Cutter's statement is an outright fabrication.In offering the truth, most notably, November 20th 1999 was a Saturday and the Human Resource Department would have been closed that weekend.

It is apparent from this paragraph that Ms. Cutter and Mr. Dunham have perjured themselves by fabricating a statement with intentional malice. As per Mr. Gary Dunham's memo dated  February 14,2000 he asks Mr. Chapman about any other concerns or incidents of continued harassment since the time he talked to Ms. Cutter. Mr. Chapman answered in the positive and stated his concern about Mr. Saab maybe committing an act of violence and when asked why, he believes it was because Mr. Saab glares at him. Mr. Dunham then asked Mr. Chapman if he had any other basis to believe that Mr. Saab would commit an act of violence against him. He could offer no other basis but then mentioned his reading a court case in which glaring of an alleged Mafia hitman in a courtroom against a witness was determined to be a sufficient basis for the witness to be in fear of his  life.
**(Pls. Note that Mr. Chapman's conversation with Mr. Dunham that included the topic of any additional incident or sexual harassment is the only time Mr. Chapman brought up the glaring incident . This conversation took place in February 2000 so**

**there is no way it could be offered as statements from Ms. Cutter several months prior to them being said <Nov. 1999>)**

As for Ms. Cutter conducting an alleged investigation, Mr. Chapman believes this to be impossible. By Ms. Cutter's own admission, she requested names of witnesses in late March and then again in April. This is along with Mr. Dunham's admission that he had relied heavily on Ms. Cutter's notes from the deposition she took in December.

As for Mr. Richard Jordan claiming to have met with Mr. Chapman to investigate his complaint against Ms. Al-Uqdah, the only meeting Mr. Chapman attended with both Mr. Jordan and Mr. Killean was on Dec.2, 1999 w/c was a fact-finding meeting concerning the subject and then briefly after, in Richard Jordan's office to discuss the sexual harassment in which Mr. Chapman believed at that time Gary Dunham was recused. Mr. Chapman also believes that the relationship between Mr. Jordan and Mr. Killean may be in violation of certain RICO statutes as they have a history of proven collusion ( see attachments).

Please note that Mr. Killean's April 17th letter states that Mr. Yee had erred and should serve to acquit and exonerate Mr. Chapman's alleged disrupting dock operations.

It is stated that Ms. Al-Uqdah's actions were not motivated by any discriminatory animus. We not only feel that we have shown this to be contradictory but also driven by animosity. On the basis of race or shared heritage, the Supreme Court recently ruled that this is not a license for bigotry and there exists too much empirical data documneting the ills of black- on- black crime.